**Supreme Court**

No. 2011-167-Appeal.

(PC 07-267)

Paul Oden et al.                    :

v.                    :

Carl Schwartz, M.D.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Paul Oden et al.           :

v.                         :

Carl Schwartz, M.D.        :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  In this medical malpractice action, the defendant, Carl Schwartz, M.D. (defendant or Dr. Schwartz), appeals from a Superior Court judgment in favor of the plaintiff, Paul Oden (Oden or plaintiff).  On appeal, Dr. Schwartz argues that the trial justice erred in denying his motion for a new trial.  Specifically, he asserts that the trial justice committed reversible error in (1) refusing to instruct the jury on intervening and superseding cause; (2) admitting certain testimony pertaining to Oden's cardiac arrest following surgery in August 2004; (3) ignoring relevant and material evidence on the issue of damages; and (4) instructing the jury on insurance.  Additionally, Dr. Schwartz contends that G.L. 1956 § 9-21-10(b) (mandating prejudgment interest at a rate of 12 percent on pecuniary damages in medical malpractice actions) is unconstitutional—an issue of first impression for this Court.[1]  After reviewing the record and considering the parties' written submissions and oral arguments, we affirm the judgment of the Superior Court.

---

[1] The Rhode Island Association for Justice submitted an amicus brief to this Court, disagreeing with Dr. Schwartz's contention that G.L. 1956 § 9-21-10(b) is unconstitutional.

# I

## Facts and Travel

Oden, who was fifty-six at the time of trial, underwent open-heart surgery at age forty-nine for a mitral valve replacement[2] at Rhode Island Hospital on January 26, 2004. Arun K. Singh, M.D. (Dr. Singh), a heart surgeon at Rhode Island Hospital, performed the surgery. Doctor Schwartz was the echocardiologist assisting Dr. Singh with that surgery.[3]

Following the surgery, at a follow-up examination in March 2004, Oden's cardiologist diagnosed him with severe aortic insufficiency (A.I.),[4] caused by an errant suture stitched by Dr. Singh during Oden's January 2004 surgery. As a result, Oden was required to undergo a second open-heart surgery in August 2004, which was performed at Brigham and Women's Hospital. Immediately following that surgery, while in recovery, Oden suffered a cardiac arrest.

Oden then brought a medical malpractice action in the Providence County Superior Court against Rhode Island Hospital and Dr. Singh, alleging that he suffered damages attributable to their negligent conduct during his January 2004 surgery.[5] On January 17, 2007, while discovery on that action was pending, Oden brought a separate medical malpractice action against Dr. Schwartz. That action was later consolidated with the action against Dr. Singh and Rhode Island Hospital. In his complaint against Dr. Schwartz, Oden alleged that he suffered injuries as a result of Dr. Schwartz's negligent conduct at his mitral valve replacement surgery in January

---

[2] The mitral valve is located between the left atrium and left ventricle of the heart. Stedman's Medical Dictionary 2087 (28th ed. 2006).

[3] Our review of the record reveals that Dr. Schwartz also served as the anesthesiologist during Oden's January 2004 surgery. For the sake of clarity, we refer to Dr. Schwartz as simply the echocardiologist during that surgery.

[4] Aortic insufficiency is the "functional incompetence of the aortic valve, with resulting regurgitation ['backward flow'] of blood from the aorta * * *." Stedman's Medical Dictionary at 983, 1668.

[5] Oden's claims against Dr. Singh and Rhode Island Hospital were not the subject of the proceedings below, and are not before us on appeal.

2004. Additionally, Oden's wife, Linda Oden, alleged a loss of consortium claim against Dr. Schwartz, pursuant to G.L. 1956 § 9-1-41.

Just before the start of trial, Oden settled his claims against Rhode Island Hospital and Dr. Singh. On October 20, 2010—the first day of trial—Dr. Schwartz moved to amend his answer to assert an affirmative defense of intervening and superseding cause, in which he alleged that Dr. Singh's negligence was the superseding cause of Oden's injuries. The trial justice reluctantly granted that motion.[6] A six-day jury trial then commenced. Below, we summarize the testimony and evidence presented.

## A

### Summary of the Testimony

Two expert witnesses testified for Oden: Stuart Pett, M.D., a heart surgeon; and Justin D. Pearlman, M.D., an expert in the field of echocardiography. Oden also called Dr. Singh to testify on his behalf. Doctor Schwartz testified on his own behalf and also called Adam B. Lerner, M.D., an anesthesiologist, to testify for him. Additionally, Oden and his wife, Linda, testified.[7] Because Dr. Singh performed the surgery at issue, we begin with his testimony.

Doctor Singh testified that he is board certified in general surgery, cardiac surgery, and thoracic surgery and that he has practiced at Rhode Island Hospital since 1975.[8] Of the 15,000 heart surgeries he has completed since then, about 2,000 were mitral valve replacement

---

[6] At the conclusion of the trial, the trial justice later indicated that "[t]he only mistake I made in the case was allowing [Dr. Schwartz] to amend [his answer]."

[7] The jury ultimately rejected Linda Oden's claim for loss of consortium. Since the jury verdict with respect to that claim is not before us on appeal, we will not summarize Linda Oden's testimony as to her loss of consortium claim, and we will refer to her testimony only as it is necessary to our analysis.

[8] At the conclusion of Dr. Singh's testimony, the trial justice instructed the jury that Oden and his wife had also sued Dr. Singh for medical malpractice, which was part of a separate proceeding. She further instructed the jury "not to concern [themselves] with the outcome of that lawsuit."

surgeries, and approximately 800 were mitral valve repair surgeries. He stated that he has also performed approximately 2,000 aortic valve surgeries. He further testified that he has worked with Dr. Schwartz on hundreds of surgeries at Rhode Island Hospital since 1975.

Doctor Singh served as Oden's surgeon at his mitral valve replacement surgery in January 2004. At that surgery, he mistakenly stitched Oden's aortic valve,[9] which caused a leakage of that valve, referred to as "severe posteriorly directed [A.I.]." Consequently, Oden had to undergo a second open-heart surgery in August 2004. Doctor Singh stated that he was not aware of the A.I. until March 2004, when, at a follow-up examination, Oden's cardiologist ordered a routine echocardiogram.

In explaining this error, Dr. Singh testified that he depends upon his surgical team (whom he identified as his assistant surgeon, physician assistant, scrub nurse, anesthesiologist/ echocardiologist, and perfusionist) to cooperate and assist him while he performs a mitral valve replacement surgery. He explained that, during this type of surgery, he is unable to see behind the mitral valve to determine whether he has placed an errant suture in sewing the replacement mitral valve. Because of this, he further explained, the echocardiographer reviews an echocardiogram,[10] which reveals "how the heart is functioning, how the valve is functioning, [and] how the overall heart function is." Since he is neither an expert in echocardiography nor board certified in echocardiography, he relies on the echocardiologist's "[v]ery important" interpretation and evaluation of that testing, both before and during the open-heart surgery, which informs his ultimate decision to continue or end the surgery.

---

[9] The aortic valve is located between the left ventricle and the ascending aorta of the heart. Stedman's Medical Dictionary at 2086.

[10] An echocardiogram is defined as "[t]he record obtained by echocardiography," which means "[t]he use of ultrasound in the investigation of the heart and great vessels and diagnosis of cardiovascular lesions." Stedman's Medical Dictionary at 608.

Doctor Singh recalled that, during Oden's surgery, Dr. Schwartz reviewed the results of the echocardiograph and informed him that the "valve function prosthesis was working normal[ly][—]like [it was] supposed to do." When asked on direct examination whether "there [was] any change in Mr. Oden's aortic valve function" after he had replaced the mitral valve, he stated: "If I recall, there wasn't anything." According to Dr. Singh, the mitral valve was not leaking, and "was functioning normal[ly] after the replacement." In sum, he maintained that "[a]t the time of surgery" he did not have "reason to believe" that there was a new problem with either the mitral or aortic valve. In fact, he believed that "[i]t was a successful surgery with no complications." He further acknowledged that "[h]ypothetically * * * if [he] became aware that Dr. Schwartz was not able to evaluate the heart by echocardiograph," he would have asked him "to look for it and evaluate it properly or get help."

Moreover, Dr. Singh acknowledged that if he had learned something "of medical consequence" during the surgery, he would have documented it in Oden's medical record. He then confirmed that Oden's medical record revealed that there were no problems whatsoever with the mitral valve replacement surgery.

On cross-examination, Dr. Singh's testimony changed somewhat regarding whether he was aware of any new problems involving Oden's aortic valve. He admitted that, "when Mr. Oden left the operating room [after Dr. Singh performed the January 2004 surgery], [he] w[as] aware that [Oden] had mild aortic regurgitation" (which he later clarified was synonymous with mild A.I.). He testified that, after learning this, he weighed a number of factors in deciding not to put Oden back on bypass. In an effort to impeach that inconsistent testimony, on redirect examination, Oden's counsel confronted Dr. Singh with his earlier deposition testimony. In that deposition, when asked whether he was "told by [Dr. Schwartz] that there was possibly more

aortic regurgitation in Mr. Oden's heart after [he] performed [the] surgery than was present before [he] performed it," Dr. Singh had responded, "[n]o, no." Moreover, on redirect examination, he stated that, even if he had been told by Dr. Schwartz that A.I. was present, he would also have needed to know "the potential cause of the [A.I.]." He claimed, though, that at the time of the surgery, he knew the cause of the A.I. "most likely was distortion."

Doctor Schwartz testified that he had a "vague memory" regarding the presence of A.I. during Oden's open-heart surgery, but that it was his "best recollection" that he advised Dr. Singh of the A.I. at the conclusion of the mitral valve replacement. He admitted that he failed to document the A.I. in the medical record. "[I]n a perfect academic world," he testified, it would have been so documented. In any event, he stated that, he makes decisions in the operating room "in real time and not by coming back later to see what the [medical] record had showed." He acknowledged that, in this case, he "did not do a totally detailed exam" of the aortic valve; however, he felt that the exam he had performed was "adequate" in determining that there was A.I., which he had communicated to Dr. Singh.

Doctor Schwartz explained that the surgeon is the head of the surgical team in the operating room, and, as such, makes decisions as to whether or not additional procedures will be performed on a patient. The standard of care dictates that he and other members of the surgical team must defer to the surgeon's decisions in this regard. Doctor Schwartz testified that he advised Dr. Singh, the head surgeon, that there was mild A.I. He further testified that Dr. Singh, having been given this information, ultimately decided "to proceed [to] get [Oden] off bypass [because] [Oden] ha[d] a very sick heart." According to Dr. Schwartz, Dr. Singh further told him that it was just "[m]ild A.I.," which he was "not concerned about" because "[p]eople can live for many years with mild A.I. before they get symptomatic or have problems." In response,

Dr. Schwartz followed Dr. Singh's orders by "continu[ing] to take care of [Oden] and get [him] out of the operating room alive." Without Dr. Singh's order for "more information," Dr. Schwartz testified that he was not required to do anything more than advise Dr. Singh of any findings from the echocardiogram.

As stated above, Oden also called Dr. Pett, an expert in heart surgery, to testify regarding whether Dr. Singh and Dr. Schwartz deviated from the applicable standard of care in performing Oden's mitral valve replacement surgery in January 2004 and the consequences therefrom. Consistent with Dr. Singh's testimony, his review confirmed that, when Dr. Singh had stitched the newly-replaced mitral valve during surgery, he "went outside the field of where [the stitches] should have been." In so doing, Dr. Singh negligently bound the adjacent aortic valve (located approximately two to four millimeters from the mitral valve). Because the medical record characterized the surgery as "being without incident," Dr. Pett concluded that both doctors directly contravened the standard of care, which "absolutely required [them] to give a comprehensive accurate documentation" of any complications that arose during the surgery.

As had Dr. Singh, Dr. Pett testified that, following the replacement of the mitral valve, the surgeon depends upon the echocardiographer to evaluate the surgery, and, among other things, to "make sure that the valves are opening and closing okay." According to Dr. Pett, the standard of care dictates that, during this evaluation, the echocardiographer must "always check the aortic valve" and inform the surgeon of any problems. If the aortic valve has been bound down or injured by an errant suture, the standard of care requires that the surgeon "fully evaluate[ ] and characterize[ ] * * * that injury" to decide how to fix the injured valve. At that point, the injured valve can either be "repaired or replaced" by placing the patient "back on bypass."

Doctor Pett further testified that, if Dr. Schwartz, in fulfilling his duty to evaluate Oden's heart during surgery, had informed Dr. Singh about the injured aortic valve, the standard of care would have required Dr. Singh to place him back on bypass to perform an inspection to determine the best course of action. According to Dr. Pett, as a result of the failure to diagnose and fix the injured aortic valve during the January 2004 surgery, Oden had to undergo a second open-heart surgery in August 2004 to replace his aortic valve. Indeed, he testified that "[i]f [the damage to Oden's aortic] valve had been addressed at the first surgery * * * the second surgery wouldn't have been done." He stated that the close proximity in time between the two surgeries (less than seven months) was "not optimal" because, at the time of the second surgery, Oden's tissues would still have been "quite swollen [and] fragile." Consequently, this caused a situation where "getting the anatomy out [in the second surgery] [was] dangerous." He further testified that shortly after the completion of the second surgery while still in recovery, Oden suffered a cardiac arrest, which required him "to be cardioverted or shocked back into a viable rhythm."

Doctor Pett testified that Oden's risk of death had increased as a result of having received two artificial valves (the mitral and the aortic). Each valve has an approximate life of ten to fifteen years.[11] Oden was forty-nine years old at the time of his surgeries; thus, he will eventually need to undergo additional surgery to replace both of them when he is between sixty and sixty-five years old.

Oden also called Dr. Pearlman, an expert in echocardiography, to testify. His testimony centered on the standard of care for echocardiographers during a mitral valve replacement surgery. He ultimately concluded that "Dr. Schwartz * * * deviate[d] from th[at] standard of

---

[11] Doctor Pett testified that a replaced aortic valve "lasts maybe two or three years longer on the average than the mitral."

care in several regards." Additionally, he testified that the aortic valve replacement surgery in August 2004 increased Oden's risk of blood clots, stroke, infections in the heart, and death.

He stated that, before a mitral valve replacement surgery, the echocardiographer must do a "completed study which takes stock of the function of the heart and the valves and gets detailed views on each valve * * * to establish the baseline condition of the patient prior to [the mitral valve replacement]." After the mitral valve replacement, but before the surgery is complete, the echocardiographer must "make sure that [the replacement] was done reasonably well; that it was effective, and also * * * rule out harm from the procedure." In so doing, the echocardiographer "look[s] at the function of the heart, look[s] at the function of the replaced valve, and also look[s] at the nearby structures, including the aortic valve." According to Dr. Pearlman, the echocardiographer also has a responsibility to communicate to the surgeon any changes he observes.

Consistent with the testimony of Dr. Pett, Dr. Pearlman testified that Dr. Schwartz deviated from the standard of care by failing to document the A.I. in Oden's medical record. Further, Dr. Pearlman took issue with Dr. Schwartz's deposition testimony, in which he stated that he had diagnosed the A.I. after the mitral valve replacement, and communicated this finding to Dr. Singh. In rejecting that deposition testimony, Dr. Pearlman concluded that Dr. Schwartz improperly relied on an "indirect view" of the aortic valve in reviewing the echocardiogram, which was not adequate information for such a diagnosis. In Dr. Pearlman's opinion, Dr. Schwartz's failure to conduct a detailed study of the aortic valve meant that he could not have properly communicated the purported finding of A.I. to Dr. Singh.

Doctor Lerner, the director of the cardiac anesthesia division at Beth Israel Deaconess Medical Center in Boston, testified for Dr. Schwartz. He testified that Dr. Schwartz met the

standard of care required of an echocardiographer in conducting the test, in which he determined that there was A.I. He further testified that Dr. Schwartz met the standard of care by advising Dr. Singh of the A.I.; however, he stated that Dr. Schwartz fell short of the standard of care in failing to document the A.I. in the medical record. On cross-examination, he acknowledged that his opinion that Dr. Schwartz had followed the standard of care was based on Dr. Schwartz's deposition testimony, in which he stated that he had told Dr. Singh about the A.I. at the time of Oden's surgery.

Oden's testimony primarily centered on his claimed damages. The record reveals that he had some difficulty speaking due to a stroke he had suffered in March 2006. Because of this, the trial justice instructed the jury "that there's no claim * * * over th[at] stroke * * *." Oden confirmed that he was "not able to get on with his life" after the January 2004 surgery because, in its wake, he soon learned that he had to gear up for a second open-heart surgery. While still in recovery after the second surgery, he testified that he suffered a cardiac arrest, in which his "heart stopped." At that point, a nurse used an "electronic shocker" to revive him. He recalled that this was "the wors[t] pain [he] ever felt." He testified that he had experienced pain since the second surgery, including pain in his chest. Knowing that he will soon have to endure a third surgery "makes [him] sad" and affects his mood. He further testified that the risks associated with that looming surgery cross his mind often.

On cross-examination, Oden acknowledged that, after his second surgery, he told his cardiologist that he felt well, although he had some chest wall discomfort. Oden further acknowledged that, in December 2005, approximately sixteen months after the second surgery, his cardiologist had reported that he felt "excellent"—"[a]lmost too good." Oden further testified that he continues to indulge in a "little bit of drinking" but that he does not get drunk.

He acknowledged that before these surgeries he would sometimes drink "six beers" in a day, and that the next day "it could be two beers" or "three beers." He further acknowledged that he continued to smoke cigarettes occasionally, although he "[didn't] really know" the quantity he smoked.

**B**

**Jury Charge and Jury Verdict**

At the conclusion of the testimony, the trial justice held a charging conference with counsel. At that conference, she addressed, among other things, whether she would issue a charge on intervening and superseding cause. After hearing arguments from counsel, she stated that she was "pretty sure" she would not do so.

The next day, the trial justice gave her closing instructions to the jury.[12] Included in those very thorough instructions was a charge on insurance, in which she stated:

> "I want to speak about one other thing, and I find it's best to directly speak about this, to discuss it openly. My experience is that jurors are often tempted to speculate about things such as medical insurance or other types of insurance or benefits. Jurors also wonder about the attorneys['] fees, who pays them, how much they will be. Jurors also wonder about what might happen to a physician's insurance premiums. I am specifically instructing you that you must not consider any of these things in deciding the case or determining what amount, if any, you will award for damages. If you were to speculate about insurance[ ] or attorneys['] fees, how much they might be or who will pay them, then you would be speculating about things that are not part of the evidence, things that the law says you must not consider and things about which you could only be guessing. If you were to try to consider, compensate for, or adjust for any of these things, you would be ignoring your duties as jurors. Worse, you could very likely cause a result or outcome that you don't intend. The law and the [c]ourt

---

[12] Prior to instructing the jury, the trial justice did not give counsel a complete copy of her instructions. Although there is no mandate that a trial justice do so, presenting counsel with the complete written instructions prior to charging the jury may be helpful. This operates to prevent any element of surprise, which in turn may reduce appeals from those jury charges.

have rules that govern these matters. They are not matters for jurors."

Also, as she had previously indicated to counsel, she did not instruct the jury on intervening and superseding cause.

Immediately following the trial justice's charge to the jury, Dr. Schwartz objected to her failure to instruct on intervening and superseding cause, as well as the instruction on insurance. With respect to the insurance charge, he averred that "black letter law" dictates that interjecting the issue of "insured risk" into the case is forbidden. In response, the trial justice stated that she "always give[s] a cautionary instruction on insurances, insurance premiums, benefits, things like that." Because there was "so much media coverage" on this subject, she deemed it "important to tell jurors that they mustn't consider" insurance as a factor in deciding the merits of the case. The trial justice reasoned: "It's a fact of life that everyone has insurance;" accordingly, she concluded that she had not "raised anything that the[ ] jurors don't know about."

Before the jury retired to deliberate, Dr. Schwartz moved for judgment as a matter of law under Rule 50(a)(1) of the Superior Court Rules of Civil Procedure.[13] The trial justice deferred her ruling on that motion until the jury reached its verdict. After less than a full day of deliberations, the jury returned a $1.5 million-dollar verdict in Oden's favor. It found that Dr. Schwartz was 25 percent responsible for Oden's injuries and that Dr. Singh was 75 percent responsible for those injuries. Thus, Dr. Schwartz was deemed responsible for $375,000 of those

---

[13] In pertinent part, Rule 50(a)(1) of the Superior Court Rules of Civil Procedure states that "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue."

damages, plus costs and statutory interest.  Additionally, the jury rejected Linda Oden's loss of consortium claim.

## C

### Posttrial Motions

After the verdict was announced, the trial justice conducted a hearing on Dr. Schwartz's Rule 50 motion, which she denied.[14]  On December 13, 2010, final judgment entered for Oden in the amount of $375,000, plus statutory interest of $170,260.27.  In a later order, the trial justice additionally awarded costs in favor of Oden in the amount of $4,416.50.  Doctor Schwartz then moved for a new trial, pursuant to Rule 59(a) of the Superior Court Rules of Civil Procedure, and he also moved to vacate, alter, or amend the judgment pursuant to Rule 59(e).  Specifically, in his motion for a new trial, Dr. Schwartz averred that the verdict was against the weight of the evidence, and that the trial justice erred in (1) refusing to instruct the jury on intervening and superseding cause; (2) introducing the concept of liability insurance in her jury instructions; and (3) permitting evidence of Oden's cardiac arrest following his second surgery.  In his motion to vacate, alter, or amend the judgment, Dr. Schwartz challenged the constitutionality of the award of prejudgment interest pursuant to § 9-21-10(b).  He further contended that the damages awarded were not supported by the evidence, and he therefore asked for a remittitur.

The trial justice denied both of Dr. Schwartz's Rule 59 motions at a hearing on February 17, 2011.  An order to that effect was entered on February 24, 2011.  In so ruling, the trial justice independently reviewed and summarized the trial testimony.  The trial justice found Dr. Pett to be credible; his testimony, she concluded, "made sense."  She noted that Dr. Pett "remained

---

[14] Following that decision, Oden moved for costs, pursuant to Rule 54(d) and (e) of the Superior Court Rules of Civil Procedure.  Because neither of the decisions on those motions is before us on appeal, we do not discuss them.

- 13 -

adamant that the echocardiographer must fully characterize the problem when [A.I.] is spotted." Moreover, she credited Dr. Pett's testimony that, "if Dr. Schwartz had done his job and fully evaluated and characterized the injury, it would have been discovered that Mr. Oden's aortic [valve] was bound down. * * * [T]his problem could have been corrected during that same surgery, thus avoiding the second surgery * * *."

Next, the trial justice reviewed the testimony provided by Dr. Pearlman, whom she also considered to be credible. She found that his testimony was consistent with that of Dr. Pett, in which he stated that Dr. Schwartz did not properly investigate and document the A.I.

With respect to Dr. Singh, the trial justice found him "generally" not credible, and "not at all credible" when, on cross-examination, he suddenly recalled the details of a conversation he had with Dr. Schwartz in the operating room, in which he testified that he had learned of "some aortic insufficiency." Further, the trial justice remarked, Dr. Singh's "motive to fabricate was obvious" and his "physical demeanor while on the witness stand only further impaired his credibility."

Doctor Schwartz, the trial justice determined, "wasn't any more credible than Dr. Singh." Indeed, she found his explanation about his failure to document the A.I. in the medical record, while otherwise discussing it with Dr. Singh, to be "quite lame." Further, the trial justice found that Dr. Schwartz's testimony, in which he stated that he reported his finding of A.I. to Dr. Singh and that, notwithstanding that report, Dr. Singh told him not to pursue it, was not credible.

The trial justice found Oden to be "credible enough," since "[t]he medical records and common sense backed him up" when he testified about his pain, discomfort, anxiety, and sadness. She further found Linda Oden's testimony to be "quite credible," stating that her testimony corroborated that provided by Oden.

- 14 -

Lastly, she examined Dr. Lerner's testimony. It appears that she did not make a specific finding on his credibility. She determined, though, that Dr. Lerner simply "assumed Dr. Schwartz was telling the truth" about reporting the A.I. to Dr. Singh.

The trial justice also ruled on Dr. Schwartz's objection to her failure to instruct the jury on intervening and superseding cause. In explaining her decision not to instruct the jury on this theory, the trial justice stated that "[Dr.] Singh's negligence could hardly be said to be independent such that it cut off Dr. Schwartz's antecedent negligence and took over as the sole proximate cause of the harm done, thus rendering [Dr.] Schwartz's negligence totally inoperative." Further, the two doctors' roles, she explained, were "inextricably intertwined" because they operated as part of a surgical team. As such, Dr. Singh's second act of negligence (failing to follow up with Dr. Schwartz concerning the A.I.) "was hardly independent of [Dr.] Schwartz's antecedent negligence" (failing to discover and investigate the A.I.).

The trial justice also concluded that she was "correct in cautioning the jury about insurance[ ] and attorneys['] fees." "The average citizen is aware," she explained, "that many patients have health or some other kind of insurance, * * * that litigants have to pay legal fees, * * * [and] that professionals, including physicians, are required to pay for liability insurance." Moreover, since this instruction took only about thirty seconds of an over two-hour-long final instruction, she concluded that the charge concerning insurance and attorneys' fees "hardly prejudiced [the] jury."

She further determined that the "verdict does not shock the conscience." In support of this finding, she maintained that, as a result of the two doctors' negligence, Oden's life expectancy had been reduced and he "lost an important body part." Moreover, she stated, his pain and suffering was "significant" and the "mental suffering attendant to knowing what he

- 15 -

faces in the future as well as the knowledge of his reduced life expectancy would have to be substantial."

Addressing Dr. Schwartz's constitutional challenge to the statutory prejudgment interest rate, she rejected his contention that the right to a jury trial triggers strict scrutiny; rather, she reasoned, the correct test to be applied was the rational basis test. Since awarding prejudgment interest promotes settlement and compensates plaintiffs for the loss of their money while cases are pending, she concluded that the statute passed constitutional muster under a rational basis analysis. Furthermore, she stated that having a uniform prejudgment interest rate "ensures certainty in the calculation of final judgments."

Lastly, the trial justice explained that she did not err in permitting the jury to consider testimony concerning Oden's cardiac arrest following his second surgery. She stated that "[t]here was evidence that the second surgery was causally connected to Dr. Schwartz's negligence and that Mr. Oden's heart stoppage was merely a complication of that surgery." She further concluded that Dr. Schwartz was not prejudiced by the fact that the jury learned that Oden had suffered a stroke, since "[t]here was evidence that he had recovered well from his surgeries." Moreover, she continued, "there was no claim that the stroke was related to the valve replacement surgery."[15]

Ultimately, the trial justice concluded that "reasonable minds could have reached differing results with this evidence;" accordingly, she denied Dr. Schwartz's Rule 59 motions. Further, she explained, "neither [Dr. Singh nor Dr. Schwartz] was credible and the medical records are devoid of any indication that the two spotted, much less discussed, any [A.I.]."

---

[15] The trial justice explained that she usually does not revisit evidentiary rulings in a motion for a new trial, but that, in this case, she would address those rulings since Oden's counsel, out of an abundance of caution, had specifically asked her to do so.

Following the trial justice's denial of his motion for a new trial and his motion to amend, vacate, or alter the judgment, Dr. Schwartz timely appealed to this Court.

## II

## Issues on Appeal

Doctor Schwartz raises a number of issues in support of his appeal. First, he contends that the trial justice erred in refusing to instruct the jury on the issue of intervening and superseding cause. Second, he argues that the trial justice erred by admitting evidence of Oden's cardiac arrest immediately following his second surgery. Third, he maintains that the trial justice ignored relevant and material evidence on the issue of damages. Fourth, he avers that the trial justice committed an error of law by instructing the jury on the issue of liability insurance. Lastly, he asserts that § 9-21-10(b) is unconstitutional because the 12 percent prejudgment interest rate deprives litigants of both substantive and procedural due process. We address each issue in turn. Because each of the issues on appeal is subject to differing standards of review, we recite each standard as we examine each issue below.

## III

## Discussion

## A

## Instruction on Intervening and Superseding Cause

Doctor Schwartz first claims that the trial justice erred in refusing to instruct the jury on the issue of intervening and superseding cause. Doctor Schwartz argues that, even if he did not obtain sufficiently detailed views of the aortic valve in the echocardiogram, this negligence was trumped by Dr. Singh's failure to sufficiently evaluate the aortic valve at the time Dr. Schwartz alerted him to the A.I. Thus, Dr. Singh's negligence constitutes an independent intervening force

- 17 -

sufficient to break the causal connection between Dr. Schwartz's antecedent negligence and the harm to Oden.

When this Court is called upon to review "issues pertaining to jury instructions, we do so de novo." State v. Vargas, 991 A.2d 1056, 1060 (R.I. 2010). We emphasize that intervening and superseding cause is an affirmative defense. Estate of Fontes v. Salomone, 824 A.2d 433, 438 (R.I. 2003). Thus, Dr. Schwartz had the burden of proof to introduce sufficient evidence to form the basis for this instruction. See id. Our independent review of the record shows that he failed to do so.

"Intervening cause exists when an independent and unforeseeable intervening or secondary act of negligence occurs, after the alleged tortfeasor's negligence, and that secondary act becomes the sole proximate cause of the plaintiff's injuries." Seide v. State, 875 A.2d 1259, 1270 (R.I. 2005) (quoting Contois v. Town of West Warwick, 865 A.2d 1019, 1027 (R.I. 2004)). As such, "the condition created by the first actor is merely a circumstance and not the proximate cause of the accident." Pantalone v. Advanced Energy Delivery Systems, Inc., 694 A.2d 1213, 1215 (R.I. 1997) (quoting Walsh v. Israel Couture Post, No. 2274 V.F.W., 542 A.2d 1094, 1097 (R.I. 1988)). However, "an intervening act of negligence will not insulate an original tortfeasor if it appears that such intervening act is a natural and probable consequence of the initial tortfeasor's act." Walsh, 542 A.2d at 1097. Furthermore, "[i]f * * * the intervening cause was not reasonably foreseeable, the intervening or secondary act becomes the sole proximate cause of the plaintiff's injuries." Id. (quoting Almeida v. Town of North Providence, 468 A.2d 915, 917 (R.I. 1983)).

Although the trial justice allowed Dr. Schwartz to amend his answer on the first day of trial to assert an affirmative defense of intervening and superseding cause, the trial justice

- 18 -

ultimately decided that she would not instruct the jury regarding this defense. We do not disagree with her decision in that regard because based on the facts of this case it would have been improper to so instruct the jury. In her decision denying Dr. Schwartz's motion for a new trial on this issue, she stated:

> "[T]hese physicians were part of a surgical team whose duties and functions are intertwined[.] * * * [E]ach owed an independent duty to [this] patient[.] * * * There are plenty of things that can go wrong with something as complex as heart surgery. * * * That one team member failed to perform as required shouldn't relieve the other team member of his duties. These physicians' duties ran parallel. * * * Even assuming [Dr.] Singh was negligent in not asking for more information, * * * [Dr.] Singh's negligence could hardly be said to be independent such that it cut off Dr. Schwartz's antecedent negligence * * *."

She further reasoned that, "if [Dr.] Schwartz was not required to anticipate [Dr.] Singh's negligence, [then] [Dr.] Singh was not required to anticipate [Dr.] Schwartz's negligent failure to perform the requisite studies and to alert him to any problems." She continued, "[i]f anything, this is a situation in which one physician's duty includes guarding against the mistakes of another, even if those mistakes may be the result of negligence." Since both Dr. Schwartz and Dr. Singh were operating as part of a surgical team, their "roles and responsibilities were inextricably intertwined." As such, "to attempt to reduce an open heart surgery and the roles of the [doctors] to a question of who performed the last act * * * makes no sense." We agree.

An instruction on intervening and superseding cause is not proper in every case where there is harm caused by two negligent tortfeasors. It is the duty of the trial justice to decide, as a matter of law, whether the alleged negligence of the second tortfeasor was independent of the first tortfeasor. Thus, a jury instruction on intervening and superseding cause should only be given where the trial justice makes such a finding. Only if the trial justice determines that the negligence of the second tortfeasor (in this case, Dr. Singh) was independent of that of the first

(in this case, Dr. Schwartz) must the jury be instructed to decide whether that independent negligence was foreseeable to the first tortfeasor. Based on our review of the record, we cannot say that the trial justice erred in this regard. Accordingly, we are satisfied that the trial justice was correct in refusing to instruct on intervening and superseding cause.

**B**

**Admission of Testimony Pertaining to Oden's Post-Operative Cardiac Arrest**

Doctor Schwartz next avers that the trial justice erred in allowing testimony pertaining to Oden's cardiac arrest following his second open-heart surgery. In support of this contention, he asserts that "there was no testimony from any witness competent to opine that Mr. Oden's post-operative cardiac arrest in August of 2004 had anything whatsoever to do with * * * any act or omission on the part of Dr. Schwartz in connection with the surgery in January of 2004 * * *." Moreover, he further asserts that "the record [wa]s entirely devoid of any basis" for Oden's testimony that, as a result of the cardiac arrest, he experienced the "worst pain" of his life. Doctor Schwartz maintains that the cardiac arrest was nothing more than a consequence of Oden's "established long-standing nicotine and alcohol abuse."

Refuting those contentions, Oden maintains that there was, in fact, expert testimony on this point. In support of this assertion, Oden cites Dr. Pett's testimony, in which he stated that "shortly after the completion of the [second] surgery, Mr. Oden arrested and needed to be cardioverted or shocked back into a viable rhythm. * * * If his [aortic] valve had been addressed at the first surgery, * * * the second surgery wouldn't have been done. * * * [And he would have avoided] the [cardiac] arrest."

We discern no error with respect to the trial justice's allowance of testimony regarding the post-operative cardiac arrest. Doctor Pett testified that there was a nexus between the cardiac

arrest and the negligence of Dr. Schwartz in connection with the January 2004 surgery. We therefore conclude that there was enough evidence to suggest that a causal relationship existed between the cardiac arrest and Dr. Schwartz's negligence at the first surgery, such that the admission of testimony concerning the cardiac arrest was proper. See Perry v. Alessi, 890 A.2d 463, 467 (R.I. 2006). Moreover, we find Dr. Schwartz's argument that the cardiac arrest was a consequence of Oden's consumption of alcohol and nicotine to be unavailing. We agree with the trial justice that "there's absolutely no evidence to suggest that [his post-operative cardiac arrest] was caused by something independent of the * * * second surgery itself." In any event, Dr. Schwartz was able to make that argument to the jury, and the jury weighed that evidence accordingly. We are satisfied that the testimony concerning the cardiac arrest was proper.

## C

### Denial of Defendant's Request as to the Damage Award

Doctor Schwartz also ascribes error to the trial justice's denial of his request for a remittitur and his motion to vacate, alter, or amend the damage award, asserting that the jury verdict "fails to respond truly to the merits of the controversy, fails to administer substantial justice, and is against the fair weight of the evidence." Doctor Schwartz contends that the jury verdict did not accurately respond to Oden's showing, or lack thereof, of any pain and suffering. As such, Dr. Schwartz asserts that the trial justice "overlooked the simple fact that, although Mr. Oden 'faces additional high risk surgery,' he would have [had] to face this surgery even if Dr. Singh had not sutured his aortic valve in January of 2004." Since the approximate life expectancy of a replaced mitral valve is only ten to fifteen years, there is no dispute that Oden eventually would have had to endure another surgery to replace that mitral valve, no matter what happened during the January 2004 surgery.

- 21 -

Doctor Schwartz also contends that, "[e]ven if the [first] surgery * * * had gone perfectly, Mr. Oden would still have suffered pain and suffering in his recovery from that surgery." Thus, he asserts that the jury wrongly compensated Oden for his recovery from the January 2004 surgery. Moreover, Dr. Schwartz relies on Oden's medical records, which indicate that, after the first surgery, Oden "[d]enie[d] chest pain, shortness of breath * * *. There have been no palpitations, lightheadedness, [or] dizziness * * *." Further, Dr. Schwartz points out that nothing in the medical records provided by his cardiologist indicates that Oden had expressed "any concern about the [im]pending surgery" after learning of the A.I. resulting from the initial surgery. Moreover, Dr. Schwartz underscores the fact that Oden's medical records after his August 2004 surgery note that Oden "is feeling great," "feeling strong and back to his normal health," and that he feels "almost too good." These facts, he contends, belie Oden's claim for any pain or suffering damages.

Lastly, Dr. Schwartz avers that the jury's verdict was "based on sympathy and improperly reflects [Oden's] condition resulting from his stroke." Although Oden never claimed that the stroke was related to either surgery, Dr. Schwartz asserts that the jury's verdict was wrought by misplaced sympathy. Oden appeared "frail and weak" on the witness stand, had difficulty speaking, and also had difficulty remembering events. Doctor Schwartz thus contends that the jury was overcome with sympathy for Oden, and, as a result, felt compelled to award him damages for his stroke, "which was not causally related to the alleged negligence in this case."

"A trial justice may disregard an award of damages and grant a new trial * * * 'only if [that] award shocks the conscience or indicates that the jury was influenced by passion or prejudice or if the award demonstrates that the jury proceeded from a clearly erroneous basis in

assessing the fair amount of compensation to which a party is entitled.'" Murray v. Bromley, 945 A.2d 330, 333-34 (R.I. 2008) (quoting English v. Green, 787 A.2d 1146, 1150 (R.I. 2001)). Our review of a trial justice's decision to uphold the jury's damage award is the same as our review of a trial justice's decision on a motion for a new trial—that is, unless the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong, we will leave the decision undisturbed. See Bonn v. Pepin, 11 A.3d 76, 78 (R.I. 2011) and Lennon v. Dacomed Corp., 901 A.2d 582, 590 (R.I 2006) (examining whether a trial justice "overlook[ed] or misconceive[d] relevant evidence" in his decision to grant a remittitur).

We find Dr. Schwartz's criticism of the trial justice's failure to order a remittitur or a new trial to be meritless. In her decision denying these motions, the trial justice aptly performed her role in assessing the credibility of witnesses, weighing the evidence, and evaluating the propriety of the damage award. After first determining that the evidence was sufficient to establish Dr. Schwartz's negligence, she concluded that the damages award was satisfactory and that the "verdict does not shock the conscience."

She credited Dr. Pett's testimony, in which he stated that Oden now faces a higher risk of complications and death in his third surgery because both of his valves will need to be replaced, rather than just one. As a result of Dr. Schwartz's negligence, Oden now has two artificial valves. The uncontroverted testimony from Dr. Pearlman further indicated that having an artificial valve means "more artificial parts inside the body which tend to form blood clots, so there's an increase for stroke[,] [as well as an] increase[ ] [in] the risk of infection in the heart." We cannot disagree with the trial justice's determination that "Oden lost an important body part as a result of the * * * negligence," that he "faces additional high risk surgery," and that "[h]is life expectancy has been reduced."

- 23 -

We acknowledge that there was conflicting evidence as to Oden's pain and suffering—the medical records indicated that he "felt well," whereas Oden testified on direct examination regarding his pain, suffering, and mental anguish. While defense counsel capably confronted Oden with this seemingly incongruous evidence, the jury was ultimately charged with weighing it.

Furthermore, we cannot disagree with the trial justice's finding that Oden's stroke did not prejudice the jury. At the outset, we note that Oden never claimed that the stroke was in any way related to the valve replacement surgeries, nor did counsel advocate any such argument to the jury. As the trial justice indicated, "[t]here was evidence that he had recovered well from his surgeries." As such, "[t]here is no reason to think that the jury did not consider this countervailing evidence." Additionally, the fact that the jury rejected Linda Oden's loss of consortium claim further demonstrates that it was not unduly affected by sympathy for plaintiffs. Accordingly, we are satisfied that the trial justice correctly denied Dr. Schwartz's motion to vacate, alter, or amend the damage award.

## D

### Insurance Instruction

Doctor Schwartz next assails the trial justice's <u>sua</u> <u>sponte</u> instruction to the jury regarding insurance.[16] He asserts that this instruction was an error of law in direct contravention of Rule 411 of the Rhode Island Rules of Evidence. We repeat that, when this Court is called upon to review "issues pertaining to jury instructions, we do so <u>de</u> <u>novo</u>." <u>Vargas</u>, 991 A.2d at 1060. In so doing, "we examine the challenged portion in the context in which it was delivered to ascertain how a jury composed of ordinary, intelligent lay people would have understood the

---

[16] For the trial justice's full insurance instruction, <u>see</u> part I-B, <u>supra</u>.

instructions." State v. Sivo, 809 A.2d 481, 488 (R.I. 2002). In conducting this review, we first turn to the text and scope of Rule 411.

In pertinent part, Rule 411 states: "[e]vidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully." However, such evidence may be allowed "when offered for another purpose, such as proof of agency, ownership, or control, bias or prejudice of a witness, or when the court determines that in the interests of justice evidence of insurance or lack of insurance should be permitted." Id.

Although a trial justice's instructions are not "evidence," we review her instruction on insurance under Rule 411 to determine whether it violated the spirit of the rule. It is well settled that the purpose of Rule 411 is "to discourage inquiry into a defendant's indemnity in a manner calculated to influence the jury. It is applicable only where, in all the circumstances, it cannot be reasonably concluded that the jury could ignore or disregard such references to an insurer." Cochran v. Dube, 114 R.I. 149, 152, 330 A.2d 76, 78 (1975).

Here, the reference to insurance did not come about—as often happens—from counsel or from any of the testifying witnesses. Rather, in this case, the reference to insurance came directly from the trial justice during her closing instructions to the jury.

We are satisfied that the trial justice's insurance instruction was proper. Although neither party introduced evidence regarding insurance, the trial justice, who had a front-row seat to the trial proceedings, was not oblivious to the fact that the overall concept of liability insurance may have pervaded the minds of the jurors in this case. While Dr. Schwartz characterizes the trial justice's determination that the jurors were aware of insurance coverage as "speculative," we would be hard-pressed to agree. The concept of liability insurance is a wholly familiar

- 25 -

concept—from mandatory motor vehicle insurance coverage to the vigorous nationwide debate concerning medical insurance and medical liability, it can hardly be said that jurors are not thinking about liability coverage in one sense or another.  Indeed, the Advisory Committee's Note to Rule 411 declares that "[t]he Rhode Island approach tempers the rule excluding evidence of liability insurance with a realistic view of contemporary society that recognizes the ubiquitous presence of insurance."

Here, the trial justice's instruction simply addressed the reality that jurors often wonder about liability coverage, especially in instances where there is typically an insured risk, such as medical malpractice.  The trial justice's instruction did nothing more than prohibit the jury from speculating about insurance coverage in its deliberations on the merits of the case—a prohibition that directly squares with the spirit of Rule 411.  While the trial justice might more appropriately have refrained from using the phrase "a physician's insurance premiums" in her instruction, we cannot say that the use of this phrase so pervaded the minds of the jurors that they were rendered incapable of arriving at a fair and impartial verdict.  Indeed, the instruction expressly told the jurors to completely ignore any assumptions or implications concerning insurance coverage— and it is well settled that "the members of the jury are presumed to follow the trial justice's instructions."  See State v. Clark, 754 A.2d 73, 80 (R.I. 2000) (quoting State v. LaRoche, 683 A.2d 989, 1000 (R.I. 1996)).

Moreover, as the trial justice pointed out, this instruction comprised about thirty seconds of the approximately two-hour-long instruction given to the jury.  Examining the instruction in the context in which it was delivered, we agree with her that it "hardly prejudiced [the] jury." For these reasons, we conclude that the trial justice did not err in instructing the jury with regard to liability insurance.

## The Constitutionality of § 9-21-10(b)

Lastly, Dr. Schwartz contends that § 9-21-10(b) is unconstitutional because it violates the due process clause of the United States and Rhode Island constitutions.[17]  See U.S. Const. Amend. XIV, sec. 1 ("No state shall * * * deprive any person of life, liberty, or property, without due process of law * * *."); R.I. Const. art. 1, sec. 2 ("No person shall be deprived of life, liberty or property without due process of law * * *.").

At the outset, we emphasize that "this Court presumes that legislative enactments are valid and constitutional."  Mackie v. State, 936 A.2d 588, 595 (R.I. 2007) (citing Mosby v. Devine, 851 A.2d 1031, 1045 (R.I. 2004)).  As such, we "exercise[ ] the 'greatest possible caution'" in reviewing a challenge to a statute's constitutionality.  Id. (quoting Cherenzia v. Lynch, 847 A.2d 818, 822 (R.I. 2004)).  The burden lies on the party challenging the statute's constitutionality to "prove beyond a reasonable doubt that the act violates a specific provision of the [Rhode Island] [C]onstitution or the United States Constitution"—unless that standard is met, "this Court will not hold the act unconstitutional."  Id. (quoting Cherenzia, 847 A.2d at 822).  Further, this Court will not delve into the wisdom or motivations of the Legislature.  See In re Advisory Opinion to the House of Representatives, 485 A.2d 550, 552 (R.I. 1984).  "[I]f what the Legislature has done is constitutional, the reasons why it has [enacted the legislation] are irrelevant."  Id.  (quoting Holmes v. Farmer, 475 A.2d 976, 989 (R.I. 1984) (Kelleher, J., concurring)).

With that in mind, we review Dr. Schwartz's constitutional challenge to § 9-21-10(b). He asserts that the mandatory 12 percent prejudgment interest rate deprives a defendant of

---

[17] Our review of the record reveals that the Attorney General received notice pursuant to Rule 24(d) of the Superior Court Rules of Civil Procedure.

substantive due process because it infringes on a defendant's fundamental right to a jury trial. He contends that a defendant, facing the looming threat of obtaining an unfavorable judgment with the inclusion of prejudgment interest, will opt to settle rather than assert his or her right to a trial by jury.[18]  Maintaining that the right to a jury trial is a fundamental right so impinged by § 9-21-10(b), he argues that the statute must satisfy a strict scrutiny analysis, which, he concludes, it cannot.  We disagree.

Section 9-21-10(b) states in pertinent part:

> "In * * * medical malpractice actions in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date of written notice of the claim by the claimant or his or her representative to the malpractice liability insurer, or to the medical or dental health care provider or the filing of the civil action, whichever first occurs."

We cannot accept Dr. Schwartz's assertion that the right to a trial by jury in a civil case is a fundamental right and therefore subject to a strict scrutiny analysis.[19]  Doctor Schwartz has not cited a single case in direct support of this assertion.  Indeed, our independent review of this issue reveals that prejudgment interest statutes, such as the statute at issue here, do not implicate a fundamental right but rather are likened to economic legislation, which is subject to a rational basis review.  See Galayda v. Lake Hospital Systems, Inc., 644 N.E.2d 298, 303 (Ohio 1994) (agreeing with the "overwhelming weight of authority that prejudgment interest statutes are rationally related to the legitimate goals of encouraging prompt resolution of disputes, and ensuring prompt payment of compensation").

---

[18] We pause to note that Dr. Schwartz got his jury trial in this case—a reality wholly inconsistent with his argument that the magnitude of the prejudgment interest rate infringes on a defendant's right to one.

[19] Although our state constitution provides that "[t]he right of trial by jury shall remain inviolate," we do not liken this mandate to a fundamental right.  See R.I. Const. art. 1, sec. 15.

We therefore examine whether the statute passes constitutional muster under a rational basis standard of review. As such, the statute will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for the 12 percent prejudgment interest rate in medical malpractice actions. See Federal Communications Commission v. Beach Communications, Inc., 508 U.S. 307, 313 (1993).

This Court has consistently stated that prejudgment interest "is not an element of damages but is purely statutory, peremptorily added to the [compensatory damages] award by the clerk." Metropolitan Property & Casualty Insurance Co. v. Barry, 892 A.2d 915, 919 (R.I. 2006) (quoting Barbato v. Paul Revere Life Insurance Co., 794 A.2d 470, 472 (R.I. 2002)). Moreover, "[t]he dual purpose of prejudgment interest is to encourage early settlement of claims and to compensate an injured plaintiff for delay in receiving compensation to which he or she may be entitled." Id. (citing Martin v. Lumbermen's Mutual Casualty Co., 559 A.2d 1028, 1031 (R.I. 1989)).

We therefore cannot accept Dr. Schwartz's contention that the statute "operates to punish [a] [d]efendant for pursuing in good faith his [or her] right to a jury trial to resolve a fairly disputed claim." Although Dr. Schwartz takes issue with the magnitude of the prejudgment interest awarded, we cannot say that this amount is not rationally related to a legitimate state interest of promoting settlement as well as compensating an injured plaintiff for the loss of the use of money to which he or she is legally entitled. See Blue Ribbon Beef Co. v. Napolitano, 696 A.2d 1225, 1229 n.3 (R.I. 1997).

With respect to Dr. Schwartz's procedural due process argument—that the ministerial process in which the clerk of the court uniformly adds such interest deprives a defendant of his or her property without an opportunity to be heard—we likewise conclude that the statute passes

constitutional muster. The fact that the prejudgment interest award is uniform, not discretionary, is both an expedient and efficient use of judicial resources. Moreover, as noted above, the statute rationally serves a legitimate government interest.

We are thus satisfied that the statute is constitutional. As we have previously stated, "payment of interest [is] an appropriate subject for legislative action," and we cannot say that, even in today's economy, 12 percent is not a "reasonable measure of the loss sustained through delay in payment." See Rhode Island Turnpike & Bridge Authority v. Bethlehem Steel Corp., 446 A.2d 752, 757 (R.I. 1982) (quoting Funkhouser v. J.B. Preston Co., 290 U.S. 163, 168 (1933)).[20]

## IV

## Conclusion

For the reasons stated above, we affirm the judgment of the Superior Court, to which we remand the record in this case.

---

[20] Over the years, numerous bills have been introduced to reduce the prejudgment interest rate; however, the General Assembly has consistently rejected those proposals and maintained the interest rate at 12 percent. See, e.g., 2013-H 5284; 2013-S 40; 2012-H 7246; 2011-S 245; 2010-S 2047; 2010-H 7379; 2009-H 5419; 2008-H 7396; 2008-H 7654; 2007-S 49; 2007-H 5319.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**         Paul Oden et al. v. Carl Schwartz, M.D.

**CASE NO:**               No. 2011-167-Appeal.
                           (PC 07-267)

**COURT:**                 Supreme Court

**DATE OPINION FILED:**    May 16, 2013

**JUSTICES:**              Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**            Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**      Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                           Associate Justice Patricia A. Hurst

**ATTORNEYS ON APPEAL:**

                           For Plaintiff:  David Morowitz, Esq.

                           For Defendant:  Michael G. Sarli, Esq.