NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 45

No. 2015-066

| | |
|---|---|
| Concord General Mutual Insurance Company and Kevin Flanagan and Linda Flanagan | Supreme Court |
| v. | On Appeal from Superior Court, Windsor Unit, Civil Division |
| Nathan Gritman, Austin Lawson, Nicholas T. Sweet, Elizabeth Plude, Kevin Spear and Dylan Stinson | September Term, 2015 |

Mary Miles Teachout, J.

Renee L. Mobbs and Thomas C. Nuovo of Bauer Gravel Farnham, Colchester, for
  Plaintiffs-Appellees.

John J. Boylan, III, of Boylan Associates, P.C., Springfield, for Defendant-Appellant Stinson.

William H. Sorrell, Attorney General, and Benjamin D. Battles, Assistant Attorney General,
  Montpelier, for Amicus Curiae State of Vermont.


PRESENT:  Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Morse, J. (Ret.),
              Specially Assigned


¶ 1.    **ROBINSON, J.**   Defendant Dylan Stinson appeals from a judgment finding him liable to plaintiffs Kevin and Linda Flanagan for damage to their vacation home from a fire started in an outdoor fireplace on their deck by a group of teenagers who were there without their permission.  Stinson contends that: (1) there was insufficient evidence to find him liable for the damage under a concerted-action theory; (2) it was improper for the trial court to admit and rely on evidence of the actual cash value of the lost personal property; and (3) the pre and

postjudgment interest rate awarded by the trial court was unconstitutional under the U.S. and Vermont Constitutions. We affirm.

## I. Sufficiency of Evidence as to Stinson's Liability

¶ 2. On appeal from a denial of a motion for judgment as a matter of law, we view all the evidence in the light most favorable to the nonmoving party, excluding modifying evidence. See Monahan v. GMAC Mortg. Corp., 2005 VT 110, ¶ 2, 179 Vt. 167, 893 A.2d 298. When a defendant challenges the sufficiency of the evidence, we determine whether the plaintiff produced enough evidence to fairly and reasonably support all elements of the disputed claims. Id.; V.R.C.P. 50(a). The evidence in this case, viewed most favorably to the plaintiffs, reveals the following.

¶ 3. On May 26, 2009, a group of teenagers gathered at a vacation house owned by the Flanagans and located near the Okemo Mountain Resort in Ludlow. Stinson knew that the Flanagans had not given the teens permission to be there, and Stinson had previously gone to the same property with a friend to smoke marijuana.

¶ 4. The gathering began around 7:00 pm. Defendants Kevin Spear and Nicholas Sweet went to the property to smoke marijuana. Sometime after arriving, Sweet called other teenagers and invited them to join him and Spear at the property. At some point, defendant Nathan Gritman heard about the gathering and called Stinson. Stinson got a ride there from Jessica Francis, who was accompanied by defendants Elizabeth Plude and Austin Lawson. They picked Stinson up sometime after 7:40 p.m. and arrived at the property around 8:00 p.m. Gritman arrived around dusk, having walked to the property by himself. Shortly after dropping off Stinson, Francis left the property.[1]

---

[1] Spear also left the property around that time, although the testimony about when Spear left the property was mixed. Gritman testified that Spear was driving away as Gritman was approaching the property, but Plude testified that he left after a discussion about starting a fire,

¶ 5. After Francis left, the teens mulled around in the driveway, drinking beer and chatting. Stinson was among the individuals who drank beer. As the night progressed, it became chilly. Having spotted an outdoor fireplace, or chiminea, on the Flanagans' deck, the teens decided to build a fire.

¶ 6. Several witnesses testified about the building and lighting of the fire. Gritman testified that building the fire was a group effort, but he had no idea who lit the fire. Plude testified that most of the group gathered brush and dried leaves from the surrounding wooded area, and that Stinson was there at the time. She further testified that Lawson and Sweet were "the ones" who gathered the brush to start the fire. Plude testified that the fire was started with a lighter, but could not say whose lighter it was. Plude also testified that the fire was started by Sweet and Lawson.

¶ 7. Gritman, Plude, and Lawson all testified that Stinson was present on the deck partying with the group while the fire was burning. Gritman specifically testified that the fire was burning most of the time that Stinson was there, and Plude testified that Stinson participated in the party as much as the rest of the group. In addition, several witnesses testified that at some point during the evening Stinson got on the roof of the house and threw a brick or other object down while the others were sitting in front of the burning fire. Stinson himself denied that the fire was going while he was present at the house.

¶ 8. The fire they built was substantial. Gritman testified that when he put brush into the chiminea to feed the fire, flames would erupt from the top. In addition, the teens couldn't get within two or three feet of the chiminea because it was so hot. Plude corroborated Gritman's recollection, testifying that flames were shooting out of the top of the chiminea, and the fire was

---

but before the fire was actually built and started. Nobody testified that Spear was on the property when the fire was actually lit.

too hot for the teens to sit near. Plude testified that the fire got so hot that at one point she had to pull her chair back from the chiminea.

¶ 9. Around 9:46 p.m., Stinson left the property. He did not ensure that the fire was out before leaving. Nobody added additional wood or fuel to the fire after Stinson left. At around 10:00 p.m. the remaining teens—Gritman, Lawson, Plude, and Sweet— left. Prior to leaving, Gritman poured the rest of Plude's beer through the top of the chiminea to extinguish the fire, and he threw some dirt on it. When they left, however, hot coals remained in the chiminea.

¶ 10. On May 27, 2009, at 4:09 a.m., a fire was discovered at the Flanagans' property. The fire burned the house to the ground, leaving only the cement foundation, a driveway, and a cellar hole.

¶ 11. Two experts testified for plaintiffs about the mechanism of the fire. Lieutenant Nally, a fire investigator, testified that the probable cause of the house fire was the fire in the chiminea. He based his conclusion on the facts that the chiminea was putting off a great deal of heat, as evidenced by the facts that: the teens could not sit near the fire; the burn patterns suggested that the fire began on the deck; and he had eliminated every other possible source for the fire. Lieutenant Nally was not able to determine the precise mechanism by which the fire in the chiminea spread; he explained that the fire in the chiminea could have been so hot that it ignited the decking beneath it, or it may have ignited other consumable material, such as wood or brush located nearby.

¶ 12. Fire investigator David Eliason largely corroborated Lieutenant Nally's testimony. Mr. Eliason acknowledged other possible causes of the fire, including a cigarette butt or an electrical fixture, but agreed with Lieutenant Nally that the fire originating in the chiminea was the probable source of the larger fire. He based this conclusion on the facts that: the entire deck was consumed, suggesting that the fire originated on the deck; there were no abnormalities

4

in the gas or electrical heating systems at the home that might provide an alternate explanation; and, because the chiminea was made of cast iron, it had the capacity to retain heat for a "good while." Like Lieutenant Nally, Mr. Eliason acknowledged multiple mechanisms by which the fire in the chiminea could have spread, including a coal falling onto the deck, or the chiminea itself becoming destabilized.

¶ 13. After the close of evidence, the court gave the following instruction regarding concerted action liability to the jury:

> If you find that any of the six named defendants were negligent, and that the negligence caused Plaintiffs' harm, you must determine whether one or more of the three remaining defendants, Dylan Stinson, Kevin Spear, and/or Nicholas Sweet acted in concert with that negligent Defendant. A person acts in concert with another when he either, A, does a negligent act himself and does it with another or according to a common plan with another; or, B, knows that the other's conduct constitutes a breach of duty, and he gives substantial assistance or encouragement to the other who is acting negligently.
>
> . . .
>
> In sum, if you determine that any Defendant was negligent and that his or her negligence caused harm to Plaintiffs, and you determine that a remaining Defendant acted in concert with that negligent defendant, then you may find the remaining defendant liable on the basis of acting in concert with a negligent Defendant.

¶ 14. The special verdict form included three questions relating to Stinson's liability. In response to the first, "Was Mr. Stinson negligent and did his negligence proximately cause damage to [plaintiffs]," the jury answered no. The jury answered the second and third interrogatories in the affirmative:

> Were any of the following persons negligent, and did the negligence of such person proximately cause damage to [plaintiffs]: Nathan Gritman, Austin Lawson, Nicholas Sweet, Elizabeth Plude, Kevin Spear?
>
> Is Mr. Stinson liable on grounds that he acted in concert with the person or persons you found negligent in [the preceding question]?

5

Accordingly, the jury found Stinson liable. Because the jury concluded that plaintiffs had not proven that Stinson himself had engaged in a negligent act that caused the damage, Stinson's liability in this case is predicated on a "concerted-action" theory: namely, that he knew that one of the youths by the fire that night was negligent and gave substantial assistance or encouragement to him or her.

¶ 15. The trial court deferred ruling on Stinson's motions for judgment as a matter of law until after the verdict, at which time the court denied the motion. On appeal, Stinson challenges the court's denial of his motions for judgment as a matter of law, arguing that the evidence is insufficient to support a finding that he is liable.

¶ 16. We have adopted the definition of concerted action lability as stated in the Restatement (Second) of Torts § 876 (1979). See <u>Montgomery v. Devoid</u>, 2006 VT 127, ¶ 33, 181 Vt. 154, 915 A.2d 270. This section provides that a person is subject to liability for harm to a third person from the tortious conduct of another if the person:

> (a) does a tortious act in concert with the other or pursuant to a common design with [the other person], or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct [himself or herself], or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and [the person's] own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876.

¶ 17. The jury's verdict, and Stinson's arguments on appeal, turn on the second of these three alternative bases for concerted-action liability. This theory of liability requires knowledge that another's conduct constitutes a breach of duty, and substantial assistance or encouragement to the other. We recently considered this basis for liability. See <u>Lussier v. Bessette</u>, 2010 VT 104, ¶¶ 7-11, 189 Vt. 95, 16 A.3d 580. In <u>Lussier</u>, several defendants were out hunting together,

when one of them shot and killed a farmer who was sitting in the cab of his tractor in a nearby field.  Id. ¶ 2.  The shooter was convicted of involuntary manslaughter, and we affirmed his conviction.  Id.  The issue in Lussier was whether the remaining hunters, who had not in any way been involved in the shooting other than by being present in the hunting party, could be held liable under a concerted action theory.  2010 VT 104, ¶ 5.  We concluded that they could not.  Id. ¶ 15.  In reaching our conclusion, we noted that a party must have "at least some level of knowledge or awareness of the pertinent attendant circumstances" in order to be liable under a concerted action theory.  Id. ¶ 7.  In that case, the other hunters in the group had no knowledge, nor any reason to suspect, that their fellow hunter was engaging in "flagrant hunting violations." Id. ¶ 10.

¶ 18.  Knowledge alone will not result in liability under this strand of concerted-action liability.  See Restatement (Second) of Torts § 876(b).  The evidence must also support a finding that a defendant gave "substantial assistance or encouragement" to the person who breaches a duty to the third party.  A defendant cannot be liable under § 876 unless his or her conduct is "more than benign" and the defendant actively does something "to facilitate another's tortious conduct."  Simmons v. Homatas, 898 N.E.2d 1177, 1184 (Ill. App. Ct. 2008).  See Rogers v. Reagan, 823 N.E.2d 1016, 1020 (Ill. App. Ct. 2005) (holding that prong two of concerted-action liability requires that "defendant . . . actively participate in the tortious conduct of another").  To determine whether a defendant's conduct rises to the level of substantial assistance or encouragement, the Restatement calls for consideration of five factors: (1) the nature of the wrongful act; (2) the kind and amount of the assistance; (3) the relationship between the defendant and the actor; (4) the presence or absence of the defendant at the occurrence of the wrongful act; and (5) the defendant's state of mind.  Restatement (Second) of Torts § 876 cmt. d; see Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 288 (2d Cir. 2007) (Hall, J., concurring) (recognizing U.S. Court of Appeals for Second Circuit has adopted five factors for

7

determining substantial assistance or encouragement (citing <u>Halberstam v. Welch</u>, 705 F.2d 472, 488 (D.C. Cir. 1983))); <u>Halberstam</u>, 705 F.2d at 488 (applying five factors in determining that wife, who helped move burglarized goods from family home, was liable under concerted action theory for wrongful death of homeowner when husband shot him in course of burglarizing home).

¶ 19.    Applying this general framework, Stinson makes three arguments on appeal related to the sufficiency of the evidence at trial.  First, there was insufficient evidence that he knew of any negligent conduct that could cause the Flanagans' house to catch fire.  Second, even if he did know of any negligent conduct, he did not give substantial assistance or encouragement in building the fire.  Finally, there was insufficient evidence as to causation.  We analyze each argument in turn.

¶ 20.    We conclude that there was ample evidence to support the jury's inference that Stinson knew of a negligent act.[2]  A jury could find from the evidence that the fire was too hot and was spilling out of the chiminea.  Several witnesses testified that the fire was so hot they had to sit two to three feet away from the chiminea, and flames were erupting from the top of the chiminea.  There was ample evidence that the teens at the fire consumed a substantial amount of alcohol from which a factfinder could infer that they were impaired as they built and managed the fire.  Although he left before the others, the jury could conclude from the evidence that Stinson left no more than fifteen minutes before the others, and that nobody fed the fire after Stinson left.  This evidence is sufficient to support the inference that Stinson not only sat by the fire throughout the evening, but was present during the times when it was burning too hot.  Moreover, there is no evidence that Stinson took any steps to extinguish the fire, or to ensure that

---

[2]    Given the trial court's instructions and Stinson's arguments on appeal, we do not consider whether he may be held liable on the basis of his participation in a concerted plan to trespass and build a fire on the Flanagans' deck, without regard to any acts of negligence associated with the management of the fire.

8

his peers would fully extinguish the fire before they left. In contrast to the evidence in Lussier, this evidence supports the inference that Stinson knew, or had reason to suspect, that one or more of his peers was or would be negligent in managing and extinguishing the fire.

¶ 21. Similarly, there was ample evidence that Stinson gave substantial assistance or encouragement to Plude, Lawson, and Gritman in connection with the management of the fire. First, Stinson testified that he had been drinking beer with Plude, Lawson, and Gritman on the night of the fire. Further testimony revealed that the teens had been drinking forty-ounce cans of beer, and that several cans had been found on the property. The jury could have reasonably inferred from these facts that the teenagers built, maintained, and ultimately left the fire while they were substantially impaired, and that Stinson was as much a part of this group endeavor as any other. Second, Stinson was present in the driveway when the other teens agreed to build the fire in the chiminea. Third, he was present with the group when they were collecting and gathering brush. Although Plude specifically identified Lawson and Sweet as the ones who gathered the brush for the fire, Gritman and Plude testified that it was a group effort to collect materials for the fire. Fourth, Stinson was one of five youths present on the deck for most of the evening, having left only fifteen minutes prior to the other teens. He participated in the intimate gathering as much as anyone, at one point climbing on the roof of the house and throwing down an object. And, he was present when the fire was so hot that the youths could not sit right next to it. Finally, there was sufficient evidence that when Stinson left, the fire was still burning on the deck and Stinson made no effort to ensure that it would be extinguished. Based on these facts, the jury had sufficient evidence to support a finding that Stinson substantially assisted or encouraged the activities of his peers, including building a too-hot fire and leaving without fully extinguishing it. See Am. Family Mut. Ins. Co. v. Grim, 440 P.2d 621, 626 (Kan. 1968) (upholding judgment that defendant was liable under concerted-action theory for church burning

down because he entered church with other boys and despite facts he did not follow other boys into attic where fire originated or light any torches while in attic).

¶ 22.    Stinson also argues that the jury could not find him liable under a concerted-action theory because the exact means by which the fire started could not be determined. Without evidence as to the exact mechanism of ignition, he argues, we cannot know whether anyone was actually negligent and, if so, who.  This argument is unavailing because "in order for circumstantial evidence to be sufficient to sustain a finding in a civil case, such evidence need not rise to that degree of certainty which will exclude any and every other reasonable conclusion."  Grim, 440 P.2d at 624.  Although plaintiffs' experts described more than one possible mechanism of ignition, they testified that the fire in the chiminea was the likely cause. Given the evidence that the teens managed the fire while inebriated, burned the fire extremely hot, and left without fully extinguishing it, there is ample evidence from which a jury could connect the dots to conclude that negligence on the part of one or more of the teens likely caused the fire that burned down plaintiffs' house.  This is sufficient to meet the causation element.  See Yount v. Deibert, 147 P.3d 1065, 1073-74 (Kan. 2006) (reversing trial court's granting of summary judgement because plaintiff could not prove precise cause of fire within her home and stating circumstantial evidence was sufficient).

II.  Evidence of the Value of the Flanagans' Lost Personal Property

¶ 23.    Over Stinson's repeated objections, the Flanagans relied on an insurance adjuster to establish the value of the personal property the Flanagans lost in the fire.  In calculating that value, the insurance adjuster first determined the post-fire replacement cost of each item, relying in part on estimates and supporting documentation provided by the Flanagans, and in part on insurance adjusting software.  He then determined the "actual cash value" by applying a depreciation factor to each item to account for the age of each lost item relative to its expected life.  On the basis of these calculations, the adjuster testified that the total value of the Flanagans'

10

lost personal property was $100,541. In addition to allowing the testimony, the trial court denied Stinson's motion for judgment as a matter of law on the Flanagans' claim for personal property damages. With respect to the value of the lost personal property, the trial court instructed the jury that the amount to be awarded "is the amount of loss of fair market value; that is, the property's fair market value before the injury less the fair market value after the injury, if any."

¶ 24. On appeal, Stinson argues that the trial court abused its discretion in admitting the testimony, and that the trial court's calculation of the Flanagans' personal property damage was unsupported by the evidence. In particular, he argues that the methodology relied upon by the Flanagans to establish the value of their lost personal property does not reflect the actual market value of those items—the amount a willing buyer would pay a willing seller for those items in their pre-fire state.

¶ 25. We review the trial court's evidentiary ruling for abuse of discretion, Boehm v. Willis, 2006 VT 101, ¶ 12, 180 Vt. 615, 910 A.2d 908 (mem.), and its denial of Stinson's motion for judgment as a matter of law nondeferentially. Smedberg v. Detlef's Custodial Serv., Inc., 2007 VT 99, ¶¶ 23, 26, 182 Vt. 349, 940 A.2d 674 (affirming trial court's denial of motion for judgment as matter of law after applying de novo review to "legal conclusions underlying the trial court's ruling").

¶ 26. Generally, as the trial court properly instructed, the loss in value of a property as compared to its pre-injury value is the measure of damages in a negligence case. See Bartlett v. Menard, 126 Vt. 215, 215-16, 227 A.2d 300, 301 (1967). The question presented in this appeal is whether a factfinder may consider and rely on evidence of replacement cost less depreciation in determining the loss in value.

¶ 27. This Court has previously endorsed consideration of evidence of repair or restoration costs in determining loss in value. Id. at 215, 227 A.2d at 301 (endorsing instruction that allowed jury to consider repairs actually made and repair bills in determining "before and

11

after" value of car). Moreover, in the context of restitution awards against individuals convicted of crimes, we have also held that where the items are of a modest cost and have no readily ascertainable market value, evidence of replacement cost of the items may be considered. State v. Tetrault, 2012 VT 51, ¶ 13, 192 Vt. 616, 54 A.3d 146 (mem.) ("[Although] fair market value is the proper measure for damages for items with a readily ascertainable value, there is no 'blue book' for used toasters or microwaves.").

¶ 28. Accordingly, we conclude that the trial court did not abuse its discretion in allowing the insurance adjuster to testify to the value of the items lost in the fire with reference to their replacement cost less depreciation, and the jury's determination of that category of damages was supported by the evidence. Evidence of replacement cost less depreciation may have been the most probative evidence available as to market value. Moreover, Stinson was free to present to the jury countervailing evidence or argument that the replacement-cost-less-depreciation valuation was excessive relative to the loss in market value of the items in question. He failed to do so.

### III. Statutory Interest

¶ 29. Finally, Stinson argues that the trial court's award of statutory interest pursuant to 9 V.S.A. § 41a(a) (prejudgment interest) and 12 V.S.A. § 2903(c) (postjudgment interest) is unconstitutional, because it deprives him of property without due process of the law in violation of Fifth and Fourteenth Amendments to the U.S. Constitution.[3] He argues, in particular, that the

---

[3] We note that Stinson's federal constitutional challenge came close to being inadequately briefed, and therefore not subject to review. See Trudell v. State, 2013 VT 18, ¶ 30, 193 Vt. 515, 71 A.3d 1235 (declining to review constitutional challenge where party failed "to present any substantive analysis or argument on state constitutional issues"). Rather than declining review, however, we allowed the claim to move forward, and allowed additional briefing from the Attorney General who had not been alerted to the constitutional claim. See State v. Jewett, 146 Vt. 221, 222, 500 A.2d 233, 234 (1985) (allowing parties to submit supplemental briefing where original briefs were inadequate). We now have before us sufficient briefing to decide the federal claim. Stinson also raises a constitutional challenge under Articles 1, 4, 9, and 18 of the Vermont Constitution; however, he fails to provide any analysis tying his

12% rate bears no rational relationship to the intended purpose of the pre and postjudgment statutes, namely, to make plaintiffs whole, and instead operates to punish Stinson and provide a windfall to plaintiffs. See Turcotte v. Estate of LaRose, 153 Vt. 196, 199, 569 A.2d 1086, 1088 (1989) (holding plaintiffs were entitled to pre- and post-judgment interest because to not award interest would fail to "fully compensate[]" plaintiffs). In addition, he argues that the rate discourages settlements because it provides an economic boon to plaintiffs. Finally, he argues that the statutory interest rate should be tied to present market rates.

¶ 30. Generally, when reviewing a statute, we presume the statute to be constitutional and reasonable. See Badgley v. Walton, 2010 VT 68, ¶ 20, 188 Vt. 367, 10 A.3d 469. "[T]he proponent of a constitutional challenge has a very weighty burden to overcome." Id. (citing Colchester Fire Dist. No. 2 v. Sharrow, 145 Vt. 195, 199, 485 A.2d 134, 137 (1984)).

¶ 31. All parties agree that the rational-basis test applies to Stinson's Federal constitutional claim. "[W]here ordinary commercial transactions are at issue, rational-basis review requires deference to reasonable underlying legislative judgments." Armour v. City of Indianapolis, Ind., __ U.S. __, 132 S. Ct. 2073, 2080 (2012) (quotation omitted); see Kelo v. City of New London, Conn., 545 U.S. 469, 490 (2005) (Kennedy, J., concurring) (noting that where an economic regulation is challenged "under the Due Process and Equal Protection Clauses," the rational-basis test is used).

¶ 32. Given the deferential standard of review applicable in this case, if there are "any reasonably conceivable state of facts that could provide a rational basis" for the 12% rate, the statute must be upheld. FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Stinson has

challenge to the statutory interest rates to those provisions. He simply raises the provisions and never "elaborat[es] on these contentions other than to list the provisions." Pease v. Windsor Dev. Review Bd., 2011 VT 103, ¶ 29 n.4, 190 Vt. 639, 35 A.3d 1019 (mem.). "[W]e will not address state constitutional claims where they are insufficiently raised and inadequately briefed." State v. Brillon, 2010 VT 25, ¶ 5, 187 Vt. 444, 995 A.2d 557.

provided us with one explanation for why the 12% rate is not reasonably related to the purpose of the statute, which is to fully compensate plaintiffs. See Turcotte, 153 Vt. at 199. However, providing one contrary explanation does not in and of itself show that the 12% rate is not reasonably related to the statute's purpose. Again, rational basis "is a paradigm of judicial restraint," Beach Commc'ns, Inc., 508 U.S. at 314, and as long as there is "any reasonably conceivable state of facts" to support the 12% rate, id. at 313 (emphasis added), it must be upheld. Applying these principles to Stinson's case, although we acknowledge that the statutory rate is incongruous in the context of today's market conditions, we conclude that the 12% rate is reasonably related to the purpose of the statute.

¶ 33. The statutes providing for prejudgment and postjudgment interest encourage defendants to settle claims and make prompt payments after judgment, and ensure that a plaintiff is made whole. See Oden v. Schwartz, 71 A.3d 438, 458 (R.I. 2013) (upholding statutory prejudgment interest rate of 12% as reasonably related to "dual purpose of . . . encourage[ing] early settlement of claims and . . . compensat[ing] an injured plaintiff" (quotation omitted)); see also Heritage Farms, Inc. v. Markel Ins. Co., 810 N.W.2d 465, 484 (Wis. 2012) (noting that where defendant is concerned about 12% postjudgment interest rate, defendant could "protect itself against such a financial burden by simply tendering payment ahead of appeal").

¶ 34. The Legislature could reasonably conclude that a fixed rate of simple interest is a more efficient and predictable way to calculate prejudgment and postjudgment interest than a floating rate pegged to the national prime rate. Although Stinson argues otherwise, "there is no constitutional mandate that the statutory interest rate" be pegged to the national prime rate. Citibank, N.A. v. Barclays Bank, PLC, 28 F. Supp. 3d 174, 184 (S.D.N.Y. 2013); see also Newman v. Novartis Pharm. Corp., 50 F. Supp. 3d 394, 397 (E.D.N.Y. 2014) ("[T]here is nothing unconstitutional about New York [S]tate's imposition of a nine percent prejudgment interest rate.").

14

¶ 35.    The argument that a fixed 12% rate creates a windfall to plaintiffs and is punitive to defendants in periods like the present when market interest rates are low is more appropriately presented to the Legislature.  See  Emberton v. GMRI, Inc., 299 S.W.3d 565, 585 (Ky. 2009) ("[T]he fact that a twelve percent interest rate in today's economic climate may be well above the marketplace norm is a matter properly . . . considered by [Kentucky's Legislature]."); Heritage Farms, Inc., 810 N.W.2d at 484 (explaining that argument to peg Wisconsin's statutory interest to "fluctuation[s] in market conditions . . . is more appropriately addressed to the legislature" (quotation and citation omitted)).  For these reasons, we conclude that on the present record, the 12% rate is reasonably related to making plaintiffs whole, and as a result, passes rational-basis review.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 36.    **SKOGLUND, J., dissenting.**   "In concert" liability requires that the defendant know of the tortious conduct of others proximately causing the injury and that the defendant provide substantial assistance or encouragement to those engaging in it.  Here, even assuming there was sufficient evidence of Stinson's awareness of others' tortious conduct causing the fire—a doubtful proposition in and of itself—no evidence demonstrated that Stinson substantially assisted or encouraged any such conduct.  Accordingly, I respectfully dissent.

¶ 37.    The responses to the questions presented on the special verdict form provide some insight into the jurors' thinking.  The jury determined that none of the three defendants at trial had engaged in negligent conduct causing the fire, but that two of them—Stinson and Sweet— had acted in concert with the negligent conduct of one or more of the three other youths from

15

whom plaintiffs had obtained default judgments. The only defendant at trial found not to have acted in concert with the tortious conduct of others was Spear, who, according to the testimony at trial, was the only one of the youths to leave the property before the fire was started in the chiminea on the deck. The trial testimony also revealed that Stinson left the party before the other four of the five youths who went up to the deck after Spear left. One witness, Plude, estimated that Stinson left fifteen-to-twenty minutes earlier than her, while Gritman, the person she left with, estimated that Stinson left forty-five minutes earlier than them. Plude testified that Sweet and Lawson were the ones who started and fed the fire in the chiminea, and no other evidence contradicted this testimony. There was no evidence as to when Sweet and Lawson left—only that they were still there when Stinson left. The evidence concerning the attempts to extinguish the fire in the chiminea centered only on Gritman and Plude, both of whom testified that they dumped beer on the hot coals before leaving.

¶ 38. What, then, did the jury consider to be the tortious act with which Stinson and Sweet acted in concert? It could not have been the trespass by the youths. Indeed, the trial court declined to charge the jury on trespass based, in part, on "ruling as a matter of law that the trespass in this case cannot serve as the tortious act under [§ 876(b) of the Restatement] because of a lack of nexus, a causal nexus between the trespass . . . and the tort that caused the harm"—negligence. Moreover, the jury determined that three of the trespassers—Stinson, Spear, and Sweet—were not negligent and that one of them—Spear—did not act in concert with the negligent act—even though testimony indicated that he initiated the trespass.

¶ 39. The majority appears to presume that the negligent act was the manner in which the fire was made and maintained, citing testimony that the fire was so large that it forced people to move back from the chiminea and caused flames to shoot out of the top of the chiminea.[4] But

_____

[4] The majority makes much of the fact that the youths had been drinking. There was very little evidence, however, regarding the extent of the drinking. One of the youths testified

16

neither of plaintiffs' fire experts testified that it is negligent to build a fire in a chiminea that results in flames coming out of the top and/or requires persons to move back a few feet—let alone that Stinson should have known as much. More important, the evidence indicated that, by the time the youths left, there were, at most, just smoldering coals left in the chiminea. Hence, the size of the fire or flames in the chiminea was not the cause of the house fire. Indeed, the jury does not appear to have considered the making or tending of the fire to be the negligent act. The testimony indicated that Sweet was one of the two people who started and maintained the fire, yet the jury determined that he did not commit a negligent act that caused the fire. Rather, logic and the responses to the special verdict form strongly suggest that the jurors considered the negligent act to be not extinguishing the fire properly.

¶ 40. What, then, was the evidence regarding Stinson's role with respect to the negligent act? There is no testimony in the record indicating that Stinson was present when the youths decided to make a fire in the chiminea. In any event, the jury plainly did not consider that to be an act in concert with the negligent act; the evidence indicated that Spear, whom the jury found did not act in concert with the negligent act, was present when the decision was made to build the fire. Moreover, other than one witness's affirmative response to a question by plaintiffs' attorney asking if gathering brush for the fire was "a group effort," there was no evidence that Stinson had anything to do with starting or maintaining the fire. Indeed, the principal witness among the youths, Plude, testified that Sweet and Lawson were the ones that gathered brush to start the fire and then tended it. Plaintiffs' counsel elicited testimony that Stinson was a longtime smoker who always carried a lighter, but Plude testified that they all had lighters, and there was no evidence suggesting that Stinson lit the fire with his lighter.

that "[t]here wasn't that much beer there," and the only evidence concerning the condition of the youths was testimony that Plude was intoxicated when she left the house.

17

¶ 41. Thus, the only evidence upon which the jury could have concluded that Stinson acted in concert with a negligent act was testimony indicating that he was present and participating in the party on the deck when the fire was burning and/or that he said nothing to the people remaining when he left to ensure that they extinguished the fire properly.

¶ 42. The question, then, is whether Stinson substantially encouraged or assisted in the negligent act that caused the fire, so as to be liable under § 876(b), by being present on the deck while the fire was burning and/or by failing to tell those remaining when he left to extinguish the fire before they left. In my view, this evidence fails, as a matter of law, to establish Stinson's in-concert liability.

¶ 43. "We have held that '[c]losely intertwined with the concept of substantial assistance is the principal of proximate cause,' " Lussier v. Bessette, 2010 VT 104, ¶ 11, 189 Vt. 95, 16 A.3d 580 (quoting Montgomery v. Devoid, 2006 VT 127, ¶ 21, 187 Vt. 154, 915 A.2d 270) (quotation omitted)), which "calls for a causal connection between the act for which defendant is claimed to be responsible and which is alleged to be negligent and the resulting flow of injurious consequences." Id. (quotation omitted). Similarly, the Restatement cautions that "the encouragement or assistance" must be "a substantial factor in causing the resulting tort." Restatement (Second) of Torts § 876 cmt. d (1979). In determining whether the assistance or encouragement is substantial enough to create in-concert liability, courts should consider "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." Id.

¶ 44. Regarding the first of these factors, the act "encouraged" in this case was not completely dousing the fire in the chiminea before leaving the house. The testimony was that the last youths to leave the house attempted to douse the remaining coals but presumably did a poor job in doing so. There is no evidence to suggest that any comment by Stinson warning the others to make sure that the fire was extinguished properly before they left would have made any

18

difference as far as their efforts to douse it. Regarding the second and third factors, Stinson was not there when the remaining youths attempted to douse the coals in the chiminea and did not provide any assistance in that act. Regarding the fourth and fifth factors, Stinson was part of the group that may have enjoyed the fire in the chiminea, but there is absolutely no evidence as to his particular state of mind. These factors do not favor imposing in-concert liability on Stinson under the circumstances of this case.

¶ 45.    In summary, the jury imposed in-concert liability on Stinson for the negligent act of failing to extinguish the fire properly based solely on his being present on the deck when the chiminea was in use and/or failing to advise the others before he left to make sure the fire was extinguished properly. In my view, this conduct, without more, is too attenuated as a matter of law to impose liability on him under § 876(b). Cf. Norman v. Brandt, 929 N.E.2d 14, 21 (Ill. App. Ct. 2010) (concluding that first youth speeding in car—who knew that second youth following him did not know way to agreed-upon destination—did not provide substantial assistance or encouragement to second youth sufficient to establish liability under Restatement § 876(b) with respect to alleged wrongful death of passenger in second car).

_____
Associate Justice

19