NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13330

PATRICIA WALSH GREENE[1] & another[2] vs. PHILIP MORRIS USA INC. & another.[3]

Middlesex.     January 4, 2023. - May 9, 2023.

Present: Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt, & Georges, JJ.

Tobacco. Conspiracy. Fraud. Evidence, Conspiracy, Fraud. Consumer Protection Act, Unfair or deceptive act, Sale of cigarettes, Damages. Damages, Consumer protection case, Interest. Practice, Civil, Instructions to jury, Waiver, Consumer protection case, Damages, Interest. Interest.

Civil action commenced in the Superior Court Department on March 25, 2015.

The case was tried before Hélène Kazanjian, J., and motions for posttrial relief were heard by her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

---

[1] Individually and as personal representative of the estate of Frederick Douglas Greene, Jr.

[2] Thomas D. Walsh, Jr., personal representative of the estate of Frederick Douglas Greene, Jr.

[3] Star Markets Company, Inc.

Scott A. Chesin (Elliott M. Davis also present) for Philip Morris USA Inc.

Michael B. Bogdanow (Andrew Rainer also present) for the plaintiffs.

The following submitted briefs for amici curiae:

Jessica E. Garland, of California, Stuart T. Rossman, & Matthew W.H. Wessler for National Consumer Law Center.

Jennifer A. Creedon, Lauren E. Mankowski, & Kyle Bjornlund for Massachusetts Defense Lawyers Association.

Jeffrey R. White, of the District of Columbia, Thomas R. Murphy, Kevin J. Powers, J. Michael Conley, & Leslie-Anne Taylor for Massachusetts Academy of Trial Attorneys & another.

KAFKER, J.  After smoking Marlboro brand cigarettes for decades, the plaintiff Patricia Walsh Greene developed lung cancer, forcing her to undergo a difficult course of treatment that included chemotherapy, radiation therapy, and multiple brain surgeries.  She subsequently brought suit against the cigarette manufacturer, Philip Morris USA Inc. (Philip Morris).  After a lengthy trial, a Superior Court jury returned a verdict for Philip Morris on Greene's negligence and breach of warranty claims, but found for Greene on claims alleging two different types of civil conspiracy.[4]  Thereafter, the trial judge, who had reserved for herself Greene's claim under G. L. c. 93A, entered findings, rulings, and an order for judgment for Greene on that claim.  Posttrial, Philip Morris moved for judgment

---

[4] The jury also found for Greene's husband, Frederick Douglas Greene, Jr., on his loss of consortium claim; he passed away during the pendency of the suit.  Additionally, Philip Morris's codefendant, Star Markets Company, Inc., was found not liable.

notwithstanding the verdict or for a new trial, and also moved for modification of the judgments. Those motions were denied, Philip Morris timely appealed, and we transferred the case sua sponte from the Appeals Court.

In this appeal, Philip Morris argues that there was insufficient evidence to support the judgments against it, or in the alternative that it is entitled to a new trial because the jury's instructions on conspiracy included "substantial contributing factor" causation language -- erroneously, according to Philip Morris, in the wake of our decision in Doull v. Foster, 487 Mass. 1 (2021). Finally, Philip Morris argues that the twelve percent pre- and postjudgment statutory interest rates are unconstitutional.

We conclude that the jury verdict against Philip Morris for civil conspiracy and the trial judge's finding of liability under G. L. c. 93A were supported by the evidence. We further conclude that Philip Morris's only objections to the "substantial contributing factor" language in the causation instructions were in the context of instructions on the breach of warranty claim; it failed to object during the discussion of the substantially distinct causation instructions regarding the conspiracy claims, and thus has waived that argument for the purposes of this appeal. Finally, we conclude that the Legislature's pre- and postjudgment interest rates pass rational

basis review and, thus, are constitutional.  We therefore affirm.[5]

1.  Background.  Because Philip Morris contends that the evidence was insufficient to sustain the jury's verdict on conspiracy, we summarize the trial evidence in the light most favorable to the plaintiffs.  Evans v. Lorillard Tobacco Co., 465 Mass. 411, 417 (2013).

a.  Greene's smoking history.  Greene grew up surrounded by advertising and promotion for Marlboro cigarettes -- on television, in movies, on billboards, and in magazines.  Greene smoked her first Marlboro cigarette in 1971, at the age of thirteen, and soon became addicted.  As a teenager, she received many small packs of cigarettes as free samples, most of them Marlboro.  By the time she was in high school, she smoked a full pack of cigarettes a day.

Before she was able to permanently quit smoking in 1995, she had tried to quit "all the time," employing strategies ranging from nicotine patches to hypnotism.  She was not successful, although she did manage to stop smoking for nine months, in 1979 and 1980.

---

[5] We acknowledge the amicus briefs submitted by the Massachusetts Defense Lawyers Association; the National Consumer Law Center; and the Massachusetts Academy of Trial Attorneys and American Association for Justice.

After that nine-month pause, Greene elected to switch from smoking regular Marlboro Red cigarettes to Marlboro Lights. Greene saw advertisements for Marlboro Lights promising that they delivered less tar and less nicotine -- "less of the bad stuff," as she put it. She made the switch because she wanted a healthier alternative to regular Marlboros. Greene went on to smoke a pack a day of Marlboro Lights for well over a decade. In 1995, after a scare during a surgical procedure, Greene was able to stop smoking for good.

In 2013, Greene was diagnosed with lung cancer. She underwent a lobectomy and began chemotherapy, but was forced to discontinue it after it led to permanent kidney damage. By 2018, the cancer had spread to her brain, necessitating multiple surgeries and radiation; the continuing cancer recurrence also makes her ineligible for a kidney transplant.

b. The conspiracy among Philip Morris and other cigarette manufacturers. One of the plaintiffs' expert witnesses, Dr. Kenneth Cummings, provided extensive testimony regarding the cigarette industry and the conduct of its members. In December of 1953, the executives of the largest American tobacco companies, including Philip Morris, met in New York City to discuss a coordinated response to published studies substantiating a link between smoking and lung cancer. Although they internally admitted "that their own advertising and

competitive practices have been a principal factor in creating a health problem,"[6] they committed to a "united front against the claims that . . . cigarette smoking causes cancer." To that end, they hired a public relations firm to undertake a "positive . . . entirely 'pro-cigarettes'" campaign, and established the Tobacco Industry Research Committee (later renamed the Council for Tobacco Research).[7]

A primary strategy of the coordinated campaign was "to overwhelm" the voices of those who challenged cigarettes as unhealthy "with mass publication of opposed viewpoints." Its first salvo was a full-page statement published in over 400 newspapers in January of 1954, titled "A Frank Statement to Cigarette Smokers," and signed by fourteen cigarette and tobacco companies, including Philip Morris. Contrary to the understanding reflected in the signatories' internal company documents, the statement told the public that "there is no proof that cigarette smoking" caused cancer, and that the cigarette

---

[6] The attendees were also well aware of the addictive nature of cigarettes. One executive noted, "It's fortunate for us that cigarettes are a habit they can't break."

[7] They elected to act through an "informal committee" rather than establish a trade association because of antitrust concerns. In a 1978 memorandum, this research committee would be referred to by an industry executive as a "front" and a "shield" for the industry.

companies "believe[d] the products [they] make are not injurious to health."

For decades, the cigarette companies continued to publicly deny that smoking caused cancer or was addictive, even as their internal documents showed otherwise.  The record is rich with examples, with a representative sample here focusing on Philip Morris:  In 1955, Philip Morris's research head said on a news program that there was "[nothing in smoke] that give[s] us any cause for concern."  In response to a critical 1964 report by the Surgeon General, a Philip Morris director told CBS News that the industry denied that there were "any bad elements" in cigarette smoke.  In a 1976 interview, a Philip Morris executive denied that any research existed that could prove that its products caused cancer, implored viewers to "read both sides" of the issue, and promised that "if the company, as a whole, believed cigarettes were really harmful, we would not be in the business."  In 1994, Philip Morris's president testified before Congress that there was no proof that smoking was addictive or caused cancer.

As Dr. Cummings summarized, Philip Morris and its fellow cigarette manufacturers spent billions of dollars to execute a pervasive and long-lasting public relations campaign "to hide the truth about what they knew about the dangers of their

cigarettes." This campaign lasted through Greene's childhood and the entire period that she smoked.

   c. Cigarette manufacturers and alternative product lines. Dr. Cummings also testified regarding the efforts of cigarette companies to design and market different cigarette product lines. Philip Morris's head of sales determined in 1964 that, given the persistent health-based opposition to cigarette smoking, it would be advantageous for the industry to "give smokers a psychological crutch and a self-rationale to continue smoking."

One form of "crutch" was alternative product lines, which included "filtered" or "light" cigarettes. According to Dr. Cummings, cigarette manufacturers introduced these "as a way of reassuring smokers you could still do it and not suffer the same risks."[8] Internal Philip Morris market research bore this out, showing that many consumers believed light cigarettes to be healthier than regular cigarettes. This belief, however, was misplaced: research by Philip Morris showed that smokers of light cigarettes would adjust their manner of smoking, resulting

---

[8] Additional testimony on this subject was provided by the plaintiffs' marketing expert, Dr. Marvin Goldberg, who opined that (1) Philip Morris principally targeted teenagers in its advertising and marketing, (2) Philip Morris's promotion conveyed that its Marlboro Light cigarettes were safer than regular cigarettes, and (3) Philip Morris's advertising and marketing successfully caused consumers to both start smoking and, once started, to continue smoking.

in equal or greater amounts of tar and nicotine consumption compared to smoking nonlight cigarettes.  Philip Morris never disclosed this to its consumers.[9]  Finally, Philip Morris never disclosed to its consumers that internal research it conducted in the late 1970s showed that the smoke of its filtered cigarette products, such as Marlboro Lights, was more mutagenic than the smoke from its regular cigarettes.  Mutagenicity refers to the ability of a substance to damage deoxyribonucleic acid (DNA); damaged DNA is the first step toward development of cancer.

2.  <u>Discussion</u>.  a.  <u>Evidence of conspiracy</u>.  Philip Morris argues that there was insufficient evidence at trial to support the jury's findings of liability on the claims alleging civil conspiracy.  Massachusetts law recognizes two distinct theories of liability under the umbrella term of "civil conspiracy": "concerted action" conspiracy, <u>Gurney</u> v. <u>Tenney</u>, 197 Mass. 457, 466 (1908); and "true conspiracy" based on coconspirators exerting "some 'peculiar power of coercion,'" <u>Fleming</u> v. <u>Dane</u>, 304 Mass. 46, 50 (1939), quoting <u>DesLauries</u> v. <u>Shea</u>, 300 Mass.

_____

[9] Philip Morris marketing used tar and nicotine delivery measurements from a standardized Federal Trade Commission (FTC) "smoking machine" test.  Philip Morris knew that such numbers were inaccurate in real-world smoking scenarios and that, even if the FTC test showed lower numbers for light as compared to regular cigarettes, smokers would not actually receive less tar and nicotine from light cigarettes.

30, 33 (1938). See Kurker v. Hill, 44 Mass. App. Ct. 184, 188 (1998). The jury returned a verdict for Greene on both theories, including independent findings of causation, and thus we may uphold the jury's verdict if we find either theory supported by the evidence and otherwise free of error. Evans, 465 Mass. at 423 n.7 ("With separate findings of causation, a jury's award of compensatory damages may be affirmed on appeal on one theory of liability even where an appellate court finds instructional error or insufficiency of evidence as to another theory").

We first turn to the concerted action theory, which is "akin to a theory of common law joint liability in tort." Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994). This theory "applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." Kurker, 44 Mass. App. Ct. at 189, quoting Stock v. Fife, 13 Mass. App. Ct. 75, 82 n.10 (1982). See Gurney, 197 Mass. at 466 ("if [defendants] acted jointly, each would be liable for any actionable representations made by the others by which the wrong was finally accomplished"). See also Kyte v. Philip Morris Inc., 408 Mass. 162, 167 (1990) (conspiracy claim must fail where "record shows that there was no common design or

concerted action between Philip Morris and [retail seller of cigarettes]").

Here, the underlying tort Greene alleged was fraudulent misrepresentation -- that Philip Morris and its coconspirators misrepresented the health consequences of cigarettes and their addictiveness.  See Masingill v. EMC Corp., 449 Mass. 532, 540 (2007), quoting Kilroy v. Barron, 326 Mass. 464, 465 (1950) ("To recover for fraudulent misrepresentation, a plaintiff 'must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [her] damage'").  Apart from referring to an "alleged" conspiracy, Philip Morris does not on appeal dispute that the plaintiffs introduced sufficient evidence of agreement between it and the other cigarette entities to deceive the public about the dangers of smoking, nor does it dispute the falsity of many of the coconspirators' statements in evidence.  Further, Philip Morris does not dispute the evidence of medical causation, i.e., that smoking causes the type of cancer from which Greene suffered.

Instead, Philip Morris attacks the causal connection between the conspirators' acts and Greene's smoking, especially reliance.  It first asserts that the plaintiffs failed to show

that Greene actually relied upon any of the coconspirators' misrepresentations, citing to Greene's testimony that she started smoking because of Marlboro advertisements that said nothing at all about the risks of smoking, and her admission that she had not read (nor even heard of) various documents prepared by the conspirators, including those produced by the Tobacco Industry Research Committee.

This view of the evidence is far too narrow. In assessing sufficiency of the evidence "[w]e review the evidence in the light most favorable to the jury verdict, assessing whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff" (quotation and citation omitted). Devaney v. Zucchini Gold, LLC, 489 Mass. 514, 528 (2022). Through that lens, the evidence showed that the conspiracy, of which Philip Morris was a significant part, undertook a unified, pervasive campaign to hide the true health risks of smoking from prospective and actual smokers, by overwhelming and drowning out the voices seeking to establish the dangers of smoking with mass publication of false and deceptive pseudoscientific statements regarding their safety. The effect was to create a smoke screen of deception and disinformation concealing the true dangers of cigarette smoking, including the dangers of the "low tar and

nicotine" cigarettes being marketed to her as a safer alternative, despite the industry's knowledge of compensation and the mutagenic effects of smoking such cigarettes.  A reasonable jury could conclude that Greene was exposed to this smoke screen of misinformation, or at least its over-all effects, as well as the deceptive marketing campaign, particularly that directed at low tar and nicotine cigarettes, and that all of this fraud and deception helped to conceal the dangers of continuing to smoke from her.  See Sullivan v. Five Acres Realty Trust, 487 Mass. 64, 73-74 (2021), quoting Boston Five Cents Sav. Bank v. Brooks, 309 Mass. 52, 55 (1941) ("Deception need not be direct to come within reach of the law. Declarations and conduct calculated to mislead and which in fact do mislead one who is acting reasonably are enough to constitute fraud").

Of course, plaintiffs seeking to prove reliance must do more than introduce evidence that falsehoods were in the air, however pervasively:  they must establish causation by proving that they themselves relied on those falsehoods.  "The element of reliance overlaps with (and may be considered a form of) the usual requirement in tort that a defendant's wrong be a factual or 'but for' cause of the harm that the plaintiff suffered." Restatement (Third) of Torts:  Liability for Economic Harm § 11 comment a (2020).  See Prentice v. R.J. Reynolds Tobacco Co.,

338 So. 3d 831, 838-840 (Fla. 2022) (discussing reliance as applied to fraud claims against cigarette companies). "Only recipients of the defendants' statements were capable of being deceived by those statements. No statements, no deception, no causation." Prentice, supra at 840.

In the case at bar, we conclude that Greene has met this requirement by introducing evidence of her detrimental reliance on the conspiracy's misrepresentations regarding filtered cigarettes. Philip Morris represented that such products, including Marlboro Lights, delivered lower tar and nicotine and were a healthier alternative to regular cigarettes. Given Philip Morris's research regarding compensation and mutagenicity, the jury could find that these representations were knowingly false. Greene testified that she received these false messages, that she believed them, and that she switched to Marlboro Lights because of this belief. Particularly against the backdrop of her exposure to the conspiracy's broader disinformation campaign, a reasonable jury could conclude that Greene was exposed to the fraud and deception in the particular marketing and messaging regarding filtered cigarettes and that she relied on it to justify her continuing to smoke Marlboro Lights. Compare Philip Morris USA Inc. vs. Holliman, Fla. Dist. Ct. App., No. 3D19-1739 (Dec. 14, 2022) (finding sufficient evidence of reliance where testimony was that [1] coconspirators

made misrepresentations regarding health risks of smoking on television programs, [2] decedent watched those or similar programs, and [3] after watching them decedent expressed belief that smoking was not harmful and continued to smoke), with Brown v. R.J. Reynolds Tobacco Co., 38 F.4th 1313, 1324 (11th Cir. 2022) (finding insufficient evidence of reliance where plaintiff only testified to "brief recollection of a Marlboro Man advertisement, but . . . could not explain what it was about the Marlboro Man advertisement that influenced her decision to smoke").

Philip Morris also argues that Greene could not rely on the conspirator's statements to her detriment because she testified that she was aware that smoking was dangerous, yet chose to smoke anyway. Cf. Laramie v. Philip Morris USA Inc., 488 Mass. 399, 403 (2021) ("Philip Morris argued that [decedent] caused his own death because, despite being adequately informed of the health risks of smoking, [he] chose to smoke, and then chose not to quit smoking"). This argument again oversimplifies the evidence. The conspirators expressly misrepresented to the public that they would not have been in the business of selling cigarettes if cigarettes were truly dangerous, and Greene explicitly bought into that false messaging. Given the extent of the efforts of the coconspirators to deceive the public and conceal the health risks of smoking -- including its highly

addictive nature and the comparative dangers of filtered cigarettes, which were marketed as being lower in tar and nicotine and, thus, a safer alternative when the conspirators knew they were not due to compensation -- the jury could have found that Greene would have smoked less, or quit sooner, absent the conspiracy's campaign of fraud and deception.  See United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 475 (D.D.C. 2006), aff'd in part and vacated in part, 566 F.3d 1095 (D.C. Cir. 2009), cert. denied, 561 U.S. 1025 (2010) ("even though low tar smokers may have a greater desire to quit, the misperception of increased safety associated with low tar cigarettes persuades them to avoid quitting").  Indeed, Greene's decision to switch to Marlboro Lights shows that her perception of the health impact of smoking affected her smoking choices.

In sum, the plaintiffs introduced sufficient evidence to support the verdict in their favor for civil conspiracy.[10]  The

---

[10] Because we find Greene's concerted action theory of civil conspiracy to be supported by the evidence, we need not evaluate the alternate theory found by the jury, that of true conspiracy. See Evans, 465 Mass. at 423 n.7.  To prevail on a true conspiracy claim, a plaintiff must prove that alleged conspirators agreed to accomplish an unlawful purpose or "a lawful purpose by unlawful means," Willett v. Herrick, 242 Mass. 471, 479-480 (1922), and then caused harm to the plaintiff via "some 'peculiar power of coercion'" that they would not have had, had they been acting independently (citation omitted), DesLauries, 300 Mass. at 33.  We have noted, however, that "instances of conspiracy which is in itself an independent tort are rare and should be added to with caution."  Fleming, 304

trial judge did not err in denying Philip Morris's motion for judgment notwithstanding the verdict or for a new trial.

b. Jury instructions, and objections. The defendant, relying on our recent decision in Doull, 487 Mass. 1, contends that the judge erroneously instructed the jury on causation on all counts, including the conspiracy counts, by including language about substantial contributing factor rather than but-for causation. In Doull, supra at 19, we considered the argument of plaintiffs in a medical negligence case that they were entitled to a jury instruction on "substantial contributing factor" causation. We ultimately concluded that "a but-for standard, rather than a substantial factor standard, is the appropriate standard for factual causation in negligence cases involving multiple alleged causes of the harm," when but-for causation can be established. Id. at 16-17.

In the case at bar, the judge used substantial factor terminology as part of the jury instructions on conspiracy. On

Mass. at 50. In the instant case, the plaintiffs contend that the peculiar power of coercion derived from the cigarette companies' unified, pervasive campaign to hide the true health risks of smoking, which would not have been so powerful and effective had companies in the conspiracy broken ranks. As there is, however, little guiding authority for the application of the true conspiracy theory in the context of cigarette litigation, see Philip Morris USA Inc. v. Putney, 199 So. 3d 465, 469 (Fla. Dist. Ct. App. 2016), overruled in part by Odom v. R.J. Reynolds Tobacco Co., 254 So. 3d 268 (2018), we conclude it to be prudent not to address and resolve the issue unnecessarily.

the concerted action theory, however, the judge also further defined substantial contributing factor to mean that the plaintiff "reasonably relied on a false statement and that she was injured as a result." The judge also instructed on the power of coercion theory, that the jury were to determine whether the "cancer resulted from the power exercised by" the conspirators. As such, the inclusion of substantial contributing factor language did not invite the jury to skip the causation inquiry altogether. See Doull, 487 Mass. at 15 (including instruction on substantial contributing factor without but-for causation instruction in cases in which but-for causation can be established "invite[s] jurors to skip the factual causation inquiry altogether").

To pursue its argument on this issue on appeal, however, Philip Morris must show that it properly raised and argued it before the trial court. "As provided by the Massachusetts Rules of Civil Procedure, '[n]o party may assign as error the giving or failure to give an instruction unless [the party] objects thereto before the jury retire[] to consider [their] verdict, stating distinctly the matter to which [the party] objects and the grounds of [the] objection.'" Rotkiewicz v. Sadowsky, 431 Mass. 748, 750-751 (2000), quoting Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974). "The primary purpose of the rule is to put the judge on notice of the issue," and thus, "[a] party

objecting to the inclusion or exclusion of an instruction must . . . clearly bring the objection and the grounds for it to the attention of the judge." Rotkiewicz, supra at 751.

No such notice was given here on the conspiracy instructions. The manner in which Philip Morris's trial counsel treated each claim during the charge conference provides an instructive contrast. The parties began the charge conference by discussing the instructions for Greene's warranty claim. Philip Morris requested a more explicit "but-for" causation instruction, in substitution for, or in addition to, the judge's proposed instruction on "substantial contributing factor" causation. The conference next turned to the plaintiffs' negligence claim. Here, counsel for Philip Morris referenced his earlier "vociferous and long-winded" objection regarding the substantial contributing factor language.[11]

The transcript of the discussion of the proposed instructions on conspiracy, however, tells a different story. There, counsel for Philip Morris made no substantive objection, or even reference to his prior objections to the substantial

---

[11] We disagree with Philip Morris that any further objection would have been futile. Although the trial judge at times expressed some exasperation with Philip Morris's counsel during the charge conference, she also assured him multiple times that he had the right to lodge objections as he saw fit, and she made some changes in response to his requests, including in her instruction on foreseeability on the negligence count.

contributing factor language.[12]  Indeed, his only recommendation

regarding causation instructions on the conspiracy was a

grammatical correction.  In contrast to the warranty claim,

where the objection was made, and the negligence claim, where

the objection was at least briefly raised, there is no

indication in the record that the judge was on notice of Philip

Morris's objection to the causation instructions on the

---

[12] To be sure, "the requirements of [Mass. R. Civ. P. 51 (b)] may be satisfied in a variety of ways."  Rotkiewicz, 431 Mass. at 751.  But the cases where we have found them satisfied have consistently contained more evidence of the judge being on notice than we find in the case at bar.  In Tenczar v. Indian Pond Country Club, Inc., 491 Mass. 89, 98 (2022), failure to object to a final jury instruction was not waiver where the contested issue had been raised in "opening remarks, throughout trial, and in multiple motions," with the parties and the judge having had multiple opportunities to argue the issue.

Similarly, in Rotkiewicz, 431 Mass. at 751-752, notwithstanding that it would have been "better practice . . . for defense counsel to renew the objection, with specificity," we concluded that there was no waiver where the trial judge "acknowledge[d] his awareness of the issue, explicitly ruled on it, and expressed his intention not to instruct as requested." Nowhere in the case at bar, however, did the defendant object to the causation instructions as to the conspiracy causes of action, and nowhere did the trial judge acknowledge that she had considered the specific issue and noted Philip Morris's specific objection.  See Flood v. Southland Corp., 416 Mass. 62, 66 (1993) ("Counsel proceeds at considerable peril in objecting to a jury charge simply by reference to discussions had, and rulings made, during a charge conference, in the absence of some acknowledgement by the judge that the procedure was sufficient to alert the judge to the grounds of the objection").  There were also, as emphasized supra, multiple aspects to the causation instruction on the conspiracy counts, and not just substantial contributing factor language, making the objection to substantial contributing factor language in the warranty and, arguably, negligence contexts even less meaningful.

conspiracy claims, including the substantial factor language. The judge's instructions on conspiracy also, as explained supra, included specific causation requirements making clear, on the concerted action theory, that "substantial contributing factor" meant that the plaintiff "reasonably relied on a false statement and that she was injured as a result," and on the power of coercion theory, that the jury were to determine whether the "cancer resulted from the power exercised by" the conspirators.[13] If these additional causation instructions and clarifications were not enough to satisfy Philip Morris, it needed to expressly say so. Accordingly, the issue is waived.

    c. <u>Evidence of violation of G. L. c. 93A</u>. After the jury verdict, the trial judge considered Greene's G. L. c. 93A claim. Because this claim is limited to Philip Morris's conduct after G. L. c. 93A's amendment in 1979,[14] to prevail, Greene was required to show a causal link after 1979 between Philip Morris's deception regarding Marlboro Lights -- the only

---

[13] We note that the judge was not simply copying from the model instructions on conspiracy. Rather she added case-specific causation language. The conspiracy instructions' tailored nature should have been another indication to Philip Morris that it needed to lodge specific objections to the particular causation language proposed.

[14] "The relevant 1979 amendments thus clarified that the Legislature intended to permit recovery when an unfair or deceptive act caused a personal injury loss . . . even if the consumer lost no 'money' or 'property.'" <u>Hershenow</u> v. <u>Enterprise Rent-A-Car Co. of Boston</u>, 445 Mass. 790, 798 (2006).

cigarette Greene was smoking by that point -- and her cancer.
As the trial judge explained, Greene was required to "establish
that Philip Morris's deceptive statements caused her to continue
to smoke."[15]  See Casavant v. Norwegian Cruise Line Ltd., 460
Mass. 500, 503 (2011).  See also Iannacchino v. Ford Motor Co.,
451 Mass. 623, 630 n.12 (2008).

The trial judge found such deception and a causal link to
Greene's continued smoking.  She found that Greene, a regular
smoker since 1971, quit smoking Marlboro Reds sometime around
1979-1980, and then relapsed and switched to smoking Marlboro
Lights.  The judge further found that from 1979 until Greene
stopped smoking in 1995, Philip Morris engaged in unfair and
deceptive acts within the meaning of G. L. c. 93A.  More
specifically, the judge found that Philip Morris marketed
Marlboro Lights as a cigarette with lower tar and nicotine, even
though

> "Philip Morris knew and failed to disclose that due to
> smoker compensation, Marlboro Lights did not deliver lower
> levels of tar and nicotine as compared to Marlboro Reds.
> Philip Morris also knew and failed to disclose that the
> smoke from Marlboro Lights was more mutagenic, and,
> therefore, more likely to cause genetic damage as compared
> to the smoke from Marlboro Reds.  Finally, Philip Morris
> knew that consumers believed that Marlboro Lights were
> healthier than Marlboro Reds.  Nevertheless, despite this
> knowledge, Philip Morris continued to market Marlboro
> Lights as a lower tar and nicotine cigarette until 2003,

---

[15] There is no dispute on appeal that there was sufficient
evidence introduced at trial to prove that Greene's smoking
caused her cancer.

with the intention of misleading consumers into believing that Marlboro Lights were a healthier alternative to Marlboro Reds."

The judge also found that this deception caused Greene to switch to Marlboro Lights and continue to smoke:

"[Greene] switched to Marlboro Lights because she believed that if she smoked them, as opposed to Marlboro Reds, she would have a reduced risk of health problems. Her motivation to quit was diminished as long as she held this belief. In light of Philip Morris's explicit efforts to convince consumers that Marlboro Lights were a healthier option, it was reasonable for [Greene] to hold this belief."

The judge further found that "such deception played a material role in [Greene's] choice to smoke Marlboro Lights" and that, ultimately, her cancer was caused by her continuing to smoke Marlboro Lights.

Philip Morris challenges only the trial judge's finding of causation, arguing that, where Greene was already addicted to cigarettes prior to 1979, any of its advertising messages after that point could not have influenced her smoking choices. See DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 101 (1983). We disagree. As the trial judge found, Greene switched to Marlboro Lights after quitting for a period in 1979-1980. During this time, and for years afterwards, Marlboro Lights were being promoted as a smoking option with lower tar and nicotine, and thus a healthier alternative to regular Marlboros. Reducing her exposure to tar and nicotine was also Greene's motivation for

switching to Lights. Further, there was evidence from internal Philip Morris documents and expert testimony that smokers regarded light cigarettes as an alternative to quitting. This evidence as a whole supported the trial judge's determination that Philip Morris's deceptive acts caused Greene to switch to light cigarettes and continue smoking, rather than quit.

Finally, the trial judge trebled the damages, concluding that "Philip Morris's conduct was indeed willful and knowing. Philip Morris engaged in a systematic and sustained effort to deceive consumers, including [Greene,] about the relative health risks of Marlboro Lights." As there was ample evidence of a willful and knowing deception, we affirm the trial judge's G. L. c. 93A decision in full.

d. Statutory interest rate. On the matter of interest imposed on awards of damages, two statutes are directly at issue here: G. L. c. 231, § 6B (prejudgment interest); and G. L. c. 235, § 8 (postjudgment interest). Section 6B provides the fixed rate imposed:

> "In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of the commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law" (emphasis added).

Section 8 complements this provision, stating in relevant part:

"When judgment is rendered . . . upon the verdict of a jury or the finding of a justice, interest shall be computed upon the amount of the . . . verdict or finding from the time when made to the time the judgment is entered. Every judgment for the payment of money shall bear interest from the day of its entry at the same rate per annum as provided for prejudgment interest . . . ."

Philip Morris argues that the twelve percent pre- and postjudgment interest rates, under current market conditions, are excessive in violation of its due process rights under the Federal and State Constitutions and cannot survive rational basis judicial review. Demonstrating a lack of rational basis is a high bar for Philip Morris to overcome. Under this standard, the statute must only "bear a reasonable relation to a permissible legislative objective" (quotation and citation omitted). Klein v. Catalano, 386 Mass. 701, 707 (1982). Furthermore, "it is well settled that a statute is presumed to be constitutional and every rational presumption in favor of the statute's validity is made" (quotation and citation omitted). Gillespie v. Northampton, 460 Mass. 148, 152 (2011). "The challenging party bears the burden of demonstrating beyond a reasonable doubt that there are no conceivable grounds [that] could support its validity" (quotations and citation omitted). Id. at 152-153.

As we have explained, "[t]he purpose of prejudgment interest under G. L. c. 231, § 6B, is 'to compensate a damaged party for the loss of use or the unlawful detention of money'"

(citation omitted).  McEvoy Travel Bur., Inc. v. Norton Co., 408 Mass. 704, 717 (1990).  The same is true for postjudgment interest.  Both are intended to make the injured party whole. See id.  The purpose of these statutes is "not to penalize the wrongdoer" or provide punitive damages.  See id.

Despite drawing a clear distinction between compensatory and punitive damages, we have been somewhat less clear regarding awards with interest that result in overpayment to the damaged party.  Although "[t]he damaged party is entitled to a return on the money that the party would have had but for the other party's wrongdoing[, t]o give the damaged party more than that would go beyond the purpose of the statute."  Id.

Counsel for Philip Morris essentially argues that "a significantly above-market interest rate, i.e., a flat twelve per cent rate," in today's much lower interest rate environment as compared to when the rate was set in 1982[16] provides "a windfall for plaintiffs, mak[ing] them 'more than whole,'" and thus "run[s] contrary to the policy underlying interest awards." See Secretary of Admin. & Fin. v. Labor Relations Comm'n, 434

---

[16] We have previously discussed and reviewed the limited legislative history of the fixed interest rate in G. L. c. 231, § 6B:  "In 1974, the Legislature fixed interest at eight per cent per annum.  St. 1974, c. 224, § 1.  The rate was increased to ten per cent in 1980, St. 1980, c. 322, § 2, and the present twelve per cent . . . rate in 1982.  St. 1982, c. 183, § 2." Secretary of Admin. & Fin. v. Labor Relations Comm'n, 434 Mass. 340, 347 n.10 (2001).

Mass. 340, 346-347 (2001) (<u>Labor Relations Comm'n</u>). This rate, Philip Morris argues, provides "a strong incentive to settle cases or to not appeal cases that would otherwise not be settled and would otherwise be appealed," rendering it more punitive than compensatory.

The plaintiffs disagree, explaining that, because the time periods during which interest accrues have highly variable market rates, the statutory rate avoids such fluctuations and promotes administrative ease in calculating the loss of use of money -- all of which, the plaintiffs claim, provide reasonable legislative purposes. See <u>Charles D. Bonanno Linen Serv</u>. v. <u>McCarthy</u>, 708 F.2d 1, 12 (1st Cir.), cert. denied, 464 U.S. 936 (1983) ("Section 6B establishes a simple, mechanical rule"). They further note that the twelve percent interest rate is not out of line when compared to the rate of return on the S&P 500 stock market index.

In response, Philip Morris references two statutes that set interest rates based on the "[w]eekly average one-year constant maturity Treasury yield," based on "the calendar week preceding the date of the judgment." See G. L. c. 231, § 6I (judgments against Commonwealth);[17] G. L. c. 231, § 60K (medical

---

[17] In <u>Labor Relations Comm'n</u>, we addressed the fixed twelve percent rate in G. L. c. 231, § 6B, as applied to remedial orders issued by the Labor Relations Commission after the

malpractice). While § 6I caps the interest rate, as calculated by the aforementioned Treasury yield, at "ten percent per annum," § 60K applies an interest rate of the "Treasury yield plus [two] per cent," which is then capped at the interest rate set forth in § 6B -- i.e., twelve percent.[18] Pegged to fluctuating securities, these statutes demonstrate, according to

_____

passage of G. L. c. 231, § 6I. That case is distinguishable from the facts at hand because our decision there hinged on changes in the statutory scheme. "Prior to 1993, judgments against the Commonwealth accrued prejudgment interest at the rate of twelve per cent per annum." Labor Relations Comm'n, 434 Mass. at 344. That year, however, the Legislature moved away from the application of the twelve percent fixed interest rates when the Commonwealth pays the award of damages, and instead adopted an interest rate based on the "weekly average one-year constant maturity Treasury yield." See id. at 344, 345-346 (noting amendment of eminent domain statute in same manner). We concluded that the express language of § 6I now controlled the Labor Relations Commission's remedial orders, not the more expansive statutory language in § 6B previously used, and so to apply § 6B after the passage of § 6I was an error of law. Id. at 347. We went on to note that "[t]he Legislature's decision to maintain the twelve per cent rate in certain contexts (e.g., tort judgments against private parties) despite fluctuating conditions [was] undoubtedly its prerogative" (emphasis added; footnote omitted). Id.

    [18] The Legislature enacted G. L. c. 231, § 60K, in 2004 and set the total interest rate at "the weekly average [one]-year constant maturity Treasury yield plus [four] per cent." St. 2004, c. 149, § 207. The Legislature amended that rate in 2012 to add only two, instead of four, percent to the Treasury yield. St. 2012, c. 224, § 220. Both the 2004 and 2012 versions, the latter being current, capped the interest rate as that set forth in G. L. c. 231, § 6B, which has been steady at twelve percent since 1982, St. 1982, c. 183, § 2 (increasing rate in § 6B from ten to twelve percent), suggesting that the Legislature still found a rate of twelve percent acceptable in the medical malpractice context.

Philip Morris, the absence of any administrative difficulty in employing a floating rate.  Philip Morris further argues that the stock market involves risk to the investor, while the statutory interest rate does not, rendering the comparison inapt.

Although we have found a floating rate of interest to be "tailored to [fulfill] the public policy goals underlying interest awards," Labor Relations Comm'n, 434 Mass. at 346, and the higher fixed interest rate at issue here appears to have a "baggier" fit, especially in a persistent low-interest economy, as explained supra, interest rate legislation need not be so tailored to survive rational basis review.  There is no contention that the challenged statute implicates fundamental rights or raises equal protection concerns, thus requiring strict scrutiny review.  "Under strict scrutiny review, a challenged statute may only survive when it is 'narrowly tailored to further a legitimate and compelling governmental interest'" (citation omitted).  Gillespie, 460 Mass. at 153. Other statutes, such as this one, however, need only be "reasonably related to the furtherance of a valid State interest."  Id.  "[T]he Legislature's decision to maintain the twelve per cent rate in certain contexts (e.g., tort judgments against private parties) despite fluctuating conditions" is

entitled to deference when it has any such rational basis. Labor Relations Comm'n, supra at 347.

State and Federal courts have upheld similar interest rate provisions in other States. In 2016, the Vermont Supreme Court considered nearly identical arguments as those raised by Philip Morris when reviewing its twelve percent prejudgment and postjudgment interest statutes. See Concord Gen. Mut. Ins. Co. v. Gritman, 2016 VT 45 (Gritman). Although the court agreed that the rate was "incongruous in the context of today's market conditions," it "conclude[d] that the [twelve percent] rate [was] reasonably related to the purpose of the statute" -- that is, to "encourage defendants to settle claims and make prompt payments after judgment, and ensure that a plaintiff is made whole." Id. at ¶¶ 32-33. Furthermore, "[t]he Legislature could reasonably conclude that a fixed rate of simple interest is a more efficient and predictable way to calculate prejudgment and postjudgment interest than a floating rate pegged to the national prime rate." Id. at ¶ 34.[19]

Similarly, the Rhode Island Supreme Court concluded ten years ago, in a medical malpractice case, that a twelve percent prejudgment interest rate "rationally serves a legitimate

---

[19] The Vermont Supreme Court also suggested that adjusting the interest rates "in periods like the present when market interest rates are low" is a question "more appropriately presented to the Legislature." Gritman, 2016 VT 45, ¶ 35.

government interest." Oden v. Schwartz, 71 A.3d 438, 457 (R.I. 2013).[20] The court reiterated the same rational purpose that our jurisprudence has recognized: prejudgment interest "compensate[s] an injured plaintiff for delay in receiving compensation to which he or she may be entitled." Id. Again, contrary to Philip Morris's arguments that such rates have an improper chilling effect on litigation, the Rhode Island Supreme Court noted that these statutes "encourage early settlement of claims" and that such settlement is "a legitimate [S]tate interest." Id. Moreover, the court concluded that a uniform rate "is both an expedient and efficient use of judicial resources." Id.

Also in 2013, in a breach of contract case, the United States District Court for the Southern District of New York addressed a due process challenge to New York's statute setting prejudgment interest at nine percent. Citibank, N.A. v. Barclays Bank, PLC, 28 F. Supp. 3d 174, 183 (S.D.N.Y. 2013).[21] Recognizing that the statute "rationally serves a legitimate government interest," the court noted the same rationale our case law provides: compensation to make the prevailing party

---

[20] The Vermont Supreme Court cited to this decision in its reasoning. Gritman, 2016 VT 45, ¶ 33.

[21] The Vermont Supreme Court also cited to this decision in its reasoning. Gritman, 2016 VT 45, ¶ 34.

whole while "not [imposing] a penalty against [the] defendant" (citations omitted).  Id. at 184.  The court went on to address the discrepancy between market rates and the higher fixed statutory rate, explaining that "there is no constitutional mandate that the statutory interest rate follow market rates point for point.  The appropriate interest rate is not measured by particular fluctuations in categories of interest rates for public or private securities lending" (quotation and citation omitted).  Id.

We cannot conclude that the twelve percent interest rate is either irrational or punitive, as it ensures that plaintiffs who have won in the trial court are fully compensated for the loss of the time value of their money during often lengthy periods of appeal, while the fixed rate makes the final award of damages particularly easy to calculate.  Despite the arguable windfall this rate provides in a low-interest economy, the interest amount is comparable to stock market returns over the same period; the money at issue, whether in the hands of plaintiffs or defendants, may very well have been so invested, despite the risk.  Furthermore, that this high rate may encourage settlement does not violate a defendant's due process rights.  See, e.g., Citibank, N.A., 28 F. Supp. 3d at 184; Oden, 71 A.3d at 457; Gritman, 2016 VT 45, ¶ 33.

For these reasons, we cannot conclude that the twelve percent interest rate imposed by G. L. c. 231, § 6B, and G. L. c. 235, § 8, lacks a rational basis or constitutes punitive, rather than compensatory, damages.[22]

3. Conclusion.  For the foregoing reasons, we conclude that the jury's verdict and the trial judge's G. L. c. 93A findings were supported by the evidence and that Philip Morris has waived its argument regarding the jury instructions on conspiracy.  We further conclude that the fixed prejudgment and postjudgment interest rates in G. L. c. 231, § 6B, and G. L. c. 235, § 8, are not excessive in violation of Philip Morris's due process rights under the Federal and State Constitutions. We, therefore, affirm the judgments of the Superior Court and the orders denying Philip Morris's posttrial motions.

So ordered.

---

[22] Prejudgment interest is calculated on the compensatory -- not the punitive multiple -- amount of an award of damages under G. L. c. 93A.  McEvoy Travel Bur., Inc., 408 Mass. at 716-717 ("The multiple damage provisions of [G. L.] c. 93A are designed to impose a penalty . . . .  To add prejudgment interest to these penal damages would compound the penalty and would violate the purpose of G. L. c. 231, § 6B" [citation omitted]).

As for postjudgment interest, in a case such as this, "where the amount of actual damages to be multiplied due to a [willful] or knowing violation of G. L. c. 93A . . . is based on the amount of an underlying judgment," the judgment amount that is multiplied "does not include postjudgment interest." Anderson v. National Union Fire Ins. Co. of Pittsburgh PA, 476 Mass. 377, 378, 385-386 (2017).